## FEDERAL TRADE COMMISSION v. BEECH-NUT PACKING COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 47. Argued November 10, 14, 1921.—Decided January 3, 1922.

1. A trader does not violate the Sherman Act by simply refusing to sell his goods or by withholding them from those who do not sell them at the resale prices he fixes; but he may not, by contracts or combinations express or implied, unduly hinder or obstruct the free and natural flow of interstate commerce. P. 452.

2. The public policy evinced in the Sherman Act is to be considered in determining what are " unfair methods of competition " within the Federal Trade Commission Act. P. 453.

3. A plan of merchandising, in interstate trade, which has a dangerous tendency unduly to hinder competition or to create monopoly, the Federal Trade Commission has authority to order suppressed. P. 454:

4. The respondent manufacturer, for the purpose of maintaining resale prices fixed by itself, declined to sell its products to jobbers, wholesalers or retailers who did not observe them or who sold to other dealers who failed to do so, and, to enforce this policy, ob-

tained, by the coöperation of its customers and through its agents and salesmen, and by marking and tracing the cases of its goods, the names of dealers who cut the prices or who sold to others who did so, and enrolled them as undesirable customers to whom it did not sell until they gave satisfactory assurances of their purpose to conform in the future. By these means it was enabled to suppress competition in the disposition of its products after it had sold them, by preventing all who did not conform to the resale prices from obtaining more goods, although there was no contract for fixing, maintaining or enforcing the resale prices. *Held*, that these, or any other equivalent coöperative means, should be enjoined, upon an order of the Federal Trade Commission, as an unfair method of competition. P. 454.

264 Fed. 885, reversed.

CERTIORARI to review a judgment of the Circuit Court of Appeals setting aside an order of the Federal Trade Commission.

*Mr. Solicitor General Beck,* with whom *Mr. W. H. Fuller, Mr. Marshall B. Clarke* and *Mr. Adrien F. Busick* were on the brief, for petitioner.

*Mr. Charles Wesley Dunn* for respondent.

The Sherman Act does not deprive a manufacturer or trader, engaged in an entirely private business and exercising his independent discretion in the normal course of his trade without any purpose to create or maintain a monopoly, of his fundamental right of freedom to trade, existing at common law, to wit, the right freely to sell his own property (consisting of legitimate articles of commerce) or not, as he pleases, for any reason he pleases, to whom he pleases, and to announce in advance the circumstances under which he will refuse to sell, who, when he does sell, imposes no restraint whatever upon the right of future alienation, by restrictive agreements (express or implied), since that act was enacted to preserve such fundamental right of freedom to trade, and not to impair or destroy it.

Likewise, § 5 of the Federal Trade Commission Act, does not deprive a manufacturer or trader, engaged in an entirely private business and exercising his independent discretion in the normal course of his trade without any unlawful purpose (a purpose either opposed to good morals because characterized by fraud, deception, misrepresentation, bad faith, intimidation, oppression, or some other such wrongful element, or against public policy because involving undue restraint of trade or monopoly, actual or potential, or the doing of any act otherwise prohibited by law), of this fundamental common-law right of freedom to trade, since that act, as in the case of the Clayton Act, was enacted to supplement and strengthen the Sherman Act, and thus more completely and effectually to preserve and protect such fundamental right of freedom to trade, and not to impair or destroy it.

And if § 5 of the Trade Commission Act may be construed and is applied to deprive a manufacturer or trader of this fundamental right, then that section violates the due process clause of the Fifth Amendment.

The theory upon which the Commission predicates its charge and conclusion that the refusal-to-sell policy of the respondent involves the use of an unfair method of competition outlawed by § 5, is conclusively established to be without any support or justification whatever, either in fact or law, when tested by the agreed facts and the applicable principles of law.

MR. JUSTICE DAY delivered the opinion of the court.

This case is here upon a writ of certiorari to the United States Circuit Court of Appeals for the Second Circuit, which court set aside an order of the Federal Trade Commission requiring the Beech-Nut Packing Company, a corporation engaged in the manufacture and sale of food and other products throughout the United States, to

cease and desist from carrying out a plan of resale of its products.[1] 264 Fed. 885.

The Commission condemned the plan as an unfair method of competition within the meaning of § 5 of the Federal Trade Commission Act. (38 Stat. 719).

In the original complaint it was charged that, in order to accomplish the illegal purpose intended, the Beech-Nut Company required its purchasers to agree to maintain or resell such products at standard selling prices, and that, for the purpose of maintaining such standard resale prices and for the purpose of inducing and compelling its customers to maintain and keep such standard prices, the company refused to sell its products to customers and dealers who would not agree to maintain such specified standard resale prices, and who did resell such products at the specified standard selling prices fixed and determined by the company. By stipulation before trial the complaint was amended so as to charge: That the Beech-Nut Company has adopted and enforced a system of fixing and maintaining certain specified standard prices at which its chewing gum and food products shall be

---

[1] "Now, therefore, it is ordered, that respondent, Beech-Nut Packing Company, its officers, directors, agents, servants, and employees cease and desist from directly or indirectly recommending, requiring, or by any means bringing about the resale of Beech-Nut products by distributors, whether at wholesale or retail, according to any system of prices fixed or established by respondent, and more particularly by any or all of the following means:

"1. Refusing to sell to any such distributors because of their failure to adhere to any such system of resale prices;

"2. Refusing to sell to any such distributors because of their having resold respondent's said products to other distributors who have failed to adhere to any such system of resale prices;

"3. Securing or seeking to secure the cooperation of its distributors in maintaining or enforcing any such system of resale prices;

"4. Carrying out or causing others to carry out a resale price maintenance policy by any other means."

resold by purchasers, thereof, including jobbers, whole-salers and retailers, with the purpose and effect of secur-ing the trade of such jobbers, wholesalers and retailers, and of enlisting their active support and coöperation in enlarging the sale of respondent's products, to the preju-dice of its competitors who do not require and enforce the maintenance of resale prices for their products; and with the purpose and effect of eliminating competition in prices among all jobbers, wholesalers and retailers, re-spectively, engaged in handling the products manufac-tured by the company; thereby depriving such distribu-tors of their right to sell, and preventing them from sell-ing, its products at such prices as they may deem to be, and as are, adequate and warranted by their respective selling costs and efficiency, and with various other effects; and that the company, as a means of making effective its system of resale prices and of inducing and compelling its customers and the dealer customers of its customers to maintain such resale prices, has for more than two years last past: Made it generally known to jobbers, whole-salers and retailers, respectively, that it required and insisted that they should sell its products at the resale prices so fixed by it, and refused to sell to jobbers, whole-salers or retailers not maintaining such prices; that the company threatened to and did refuse to sell to all job-bers, wholesalers and retailers who failed to maintain the resale prices so fixed by it, or who sold to other distribu-tors who failed to maintain such prices; induced or com-pelled the jobbers, wholesalers and retailers, by divers other means, not only to maintain its resale prices so fixed, but also to discontinue selling its products to other jobbers, wholesalers and retailers who did not maintain such resale prices; that the company caused the diversion of retailers' orders away from jobbers and wholesalers who did not maintain such resale prices so fixed by it, or who

had resold its products to other jobbers, wholesalers or retailers who had failed to maintain such resale prices, and caused such orders to be given to other jobbers and wholesalers who had maintained such resale prices and/or had refused to supply other jobbers, wholesalers and retailers failing to maintain such prices; that the company solicited and secured the coöperation of wholesalers, jobbers and retailers in reporting price cutters, all in pursuance of its efforts to ascertain the names of all distributors of its products who had failed to maintain the resale prices fixed by it and/or who had resold to other jobbers, wholesalers and retailers failing to maintain such prices; that it entered in card records kept by it the names of all dealers reported to it, either in this or other ways, as not maintaining its resale prices or as selling to other distributors not maintaining such prices, and has taken various measures to prevent all such dealers from obtaining further shipments of its products from any source until it has received from them declarations, promises, assurances, statements, or other similar expressions, to the effect that in the future such dealers intend to and will sell such products at the resale prices fixed by the company and will refrain from selling the same to other jobbers, wholesalers and retailers failing to maintain such prices; that respondent employed various other means and methods for the enforcement of its system of maintaining resale prices.

The case was heard before the Commission upon an agreed statement of facts, from which, among other things, it found:

The Beech-Nut Packing Company customarily markets its products principally through jobbers and wholesalers in the grocery, drug, candy and tobacco lines, who in turn resell to retailers in these lines. Such wholesale and retail dealers are selected as desirable customers because they are known or believed to be of good credit standing,

who are willing to resell at the resale prices suggested by the company and who do resell at such prices, who are willing to refuse to sell and who do refuse to sell to jobbers, wholesalers and retailers who do not resell at the resale prices suggested by the company, and who do not sell to such jobbers, wholesalers and retailers, who in other respects are good and satisfactory merchandisers. Such jobbers, wholesalers and retailers are designated by the company as " selected " or " desirable " dealers. In a few instances the company also sells " direct " to certain large retailers who are selected as are the jobbers, wholesalers and retailers. The total number of such dealers, handling the products of the company, includes the greater portion of the jobbers, wholesalers and retailers, respectively, in the grocery trades, and a large proportion of the jobbers, wholesalers and retailers in the drug, candy, and tobacco trades, respectively, throughout the United States.

The company has adopted and maintained, and still maintained at the time complaint was filed by the Commission, in the sale and distribution of its products, a policy known as the " Beech-Nut Policy ", and requests the coöperation therein of all dealers selling the products manufactured by it, dealing with each customer separately.

In order to secure such coöperation and to carry out the Beech-Nut Policy, the company:

Issues circulars, price lists, and letters to the trade generally, showing suggested uniform resale prices, both wholesale and retail, to be charged for Beech-Nut products.

Requests and insists that the selected jobbers, wholesalers and retailers sell only to such other jobbers, wholesalers and retailers as have been and are willing to resell and do resell at the prices so suggested by the company; and requests and insists that such jobbers, wholesalers

and retailers discontinue selling to other jobbers, wholesalers and retailers who fail to resell at the prices so suggested by the company.

Makes it known broadcast to such selected jobbers, wholesalers and retailers, whether sold "direct" or not, that, if they, or any of them, fail to sell at the resale prices suggested by the company, it will absolutely refuse to sell further supplies of its products to them, or any of them, and will also absolutely refuse to sell to any jobbers, wholesalers and retailers whomsoever who sell to other jobbers, wholesalers and retailers failing to resell at the prices suggested by the company.

The company, in the carrying out of its policy, has refused and does refuse to sell its products to practically all such jobbers, wholesalers and retailers as do not sell at the prices so suggested by it. It has refused and does refuse to sell to practically all such jobbers, wholesalers and retailers reselling to other jobbers, wholesalers and retailers who have failed to resell at the prices so suggested by it. It has refused and does refuse to sell to practically all so-called mail-order houses engaged in interstate commerce, on the ground that such mail-order houses frequently sell at cut prices, and has refused and does refuse to sell to practically all jobbers, wholesalers and retailers who sell its products to such mail-order houses. It has refused and does refuse to sell to practically all so-called price cutters. It has maintained and does maintain a large force of so-called specialty salesmen or representatives, who call upon the retail trade and solicit orders therefrom to be filled through jobbers and wholesalers, which orders are commonly known in the trade as "turnover orders"; its salesmen, under respondent's instructions, have refused and do refuse to accept any such turnover orders to be filled through jobbers and wholesalers who themselves sell or have sold at less than the suggested resale prices, or sell or have sold to job-

bers, wholesalers and retailers who sell or have sold at less than such suggested resale prices; and in such cases has requested such retailers to name other jobbers.

The company has reinstated and does reinstate as distributors of its products jobbers, wholesalers and retailers previously cut off or withdrawn from the list of selected jobbers, wholesalers and retailers for failure to resell at the prices suggested by it, and for selling to distributors who do not maintain such suggested resale prices, upon the basis of declarations, assurances, statements, promises, and similar expressions, as the case may be, by such distributors, respectively, who satisfy the company that such distributors will thereafter resell at the prices suggested by it and will refuse to sell to distributors who do not maintain such suggested resale prices.

The company has added and does add to its list of new distributors, concerns reported by its representatives as declaring that they intend to and will resell at the prices suggested by it and will refuse to sell to those who do not maintain such suggested resale prices. That it has utilized a system of key numbers or symbols stamped or marked upon the cases containing the "Beech-Nut Brand" products, thus enabling it, for any purpose whatsoever, to ascertain the identity of the distributors from whom such products were purchased; and that repeatedly, when instances of price-cutting have been reported to it by the selected wholesalers and retailers, or ascertained in other ways, its salesmen and representatives have been instructed by it to investigate, and that in pursuance of these instructions they have by means of these key numbers or symbols traced the price-cutters from whom the goods have been obtained, and have thus ascertained the identity of such price cutters, and have also thus traced and ascertained the identity of distributors from whom price cutters have purchased "Beech-Nut Brand" products; and it has thereafter refused to

supply all such dealers with its products, whether such dealers were themselves cutting the suggested resale prices or were selling to dealers cutting the suggested resale prices.

The company has maintained and does maintain card records containing the names of thousands of jobbing, wholesale and retail distributors, including the selected distributors, and in furtherance of its refusal to sell goods either to distributors selling at less than the suggested resale price, or to distributors selling to other distributors selling at less than the suggested resale prices, has listed upon those cards, bearing the names of such distributors, the words " Undesirable—Price Cutters ", " Do Not Sell ", or " D. N. S.", the abbrevation for " Do Not Sell ", or expressions of a like character, to indicate that the particular distributor was in the future not to be supplied with respondent's goods on account of failure to maintain the suggested resale prices, or on account of failure to discontinue selling to dealers failing to maintain such suggested resale prices. When the company has received declarations, assurances, statements, promises, or similar expressions, as the case may be, by distributors which satisfy it that such distributors will resell at the prices suggested by it, and discontinue selling to distributors failing to maintain the resale prices suggested by it, it has issued instructions to " Clear the record," or directions of similar import, notation of which is made on the cards, and it has thereafter permitted shipments of its products to be made to such distributors; and such distributors to whom shipments are thus allowed to go forward constitute the company's list of so-called " selected " jobbers, wholesalers and retailers, and no distributor is thus listed on such card records as one to whom goods are allowed to go forward who fails to maintain the resale prices suggested by it or sells to distributors failing to resell at such suggested prices; and when a jobber,

wholesaler or retailer is reported as failing to maintain the suggested resale prices, and has been entered in the card records as one to whom shipments should not go forward, respondent notifies those jobbers, wholesalers and retailers who supply the distributor, of this fact, and also notifies its specialty salesmen, and gives similar notices to such jobbers, wholesalers and retailers and to its specialty salesmen when reinstatements are made in its list of " selected " jobbers, wholesalers and retailers.

The Circuit Court of Appeals was of opinion that the only difference between the price-fixing policy condemned as unlawful in *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373, and the price-fixing plan embodied in the Beech-Nut policy was that in the former case there was an agreement in writing, while in this case the success or failure of the plan depended upon a tacit understanding with purchasers and prospective purchasers. While it expressed its difficulty in seeing any difference between a written agreement and a tacit understanding in their effect upon the restraint of trade, it, nevertheless, regarded the case as governed by the decision of this court in *United States* v. *Colgate & Co.,* 250 U. S. 300, and, accordingly, held that the Commission had exceeded its power in making the order appealed from.

The *Colgate Case* was prosecuted under the Sherman Anti-Trust Act and came to this court under the Criminal Appeals Act. We therein held that this court must accept the construction of the indictment as made in the District Court; and, that, upon such construction, the only act charged amounted to the exercise of the right of the trader, or manufacturer, engaged in private business, to exercise his own discretion as to those with whom he would deal, and to announce the circumstances under which he would refuse to sell, and that, thus interpreted, no act was charged in the indictment which amounted to a violation of the Sherman Act, prohibiting monopolies,

6267°—22——34

contracts, combinations and conspiracies in restraint of interstate commerce.

In the subsequent case of *United States* v. *Schrader's Son, Inc.,* 252 U. S. 85, this court had occasion to deal with a case under the Criminal Appeals Act, wherein there was a charge that a manufacturer sold to manufacturers in several States under an agreement to observe certain resale prices fixed by the vendor,—which we held to be a violation of the Sherman Anti-Trust Act. In referring to the *Colgate Case* we said: " The court below misapprehended the meaning and effect of the opinion and judgment in that cause. We had no intention to overrule or modify the doctrine of *Dr. Miles Medical Co.* v. *Park & Sons Co.,* [220 U. S. 373] where the effort was to destroy the dealers' independent discretion through restrictive agreements. Under the interpretation adopted by the trial court and necessarily accepted by us, the indictment failed to charge that Colgate & Company made agreements, either express or implied, which undertook to obligate vendees to observe specified resale prices; and it was treated ' as alleging only recognition of the manufacturer's undoubted right to specify resale prices and refuse to deal with anyone who failed to maintain the same.' "

In the still later case of *Frey & Son* v. *Cudahy Packing Co.,* 256 U. S. 208, wherein this court again had occasion to consider the subject, it was said of the previous decisions in *United States* v. *Colgate & Co.,* and *United States* v. *Schrader's Son., Inc., supra:* "Apparently the former case was misapprehended. The latter opinion distinctly stated that the essential agreement, combination or conspiracy might be implied from a course of dealing or other circumstances."

By these decisions it is settled that in prosecutions under the Sherman Act a trader is not guilty of violating its terms who simply refuses to sell to others, and he may withhold his goods from those who will not sell them at the

prices which he fixes for their resale. He may not, consistently with the act, go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade.

The Sherman Act is not involved here except in so far as it shows a declaration of public policy to be considered in determining what are unfair methods of competition, which the Federal Trade Commission is empowered to condemn and suppress. The case now before us was begun under the Federal Trade Commission Act which was intended to supplement previous anti-trust legislation. (See Report No. 597, of the Senate Committee on Interstate Commerce, June 13, 1914, 63rd Cong., 2nd sess.) That act declares unlawful "unfair methods of competition" and gives the Commission authority after hearing to make orders to compel the discontinuance of such methods. What shall constitute unfair methods of competition denounced by the act, is left without specific definition. Congress deemed it better to leave the subject without precise definition, and to have each case determined upon its own facts, owing to the multifarious means by which it is sought to effectuate such schemes. The Commission, in the first instance, subject to the judicial review provided, has the determination of practices which come within the scope of the act. (See Report, No. 597, Senate Committee on Interstate Commerce, June 13, 1914, 63rd Cong., 2nd sess.)

Of the Federal Trade Commission Act we said, in *Federal Trade Commission* v. *Gratz*, 253 U. S. 421, 427: "The words 'unfair method of competition' are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine as matter of law what they include. They are clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by de-

ception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly. The act was certainly not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade."

If the "Beech-Nut System of Merchandising" is against public policy because of its "dangerous tendency unduly to hinder competition or create monopoly," it was within the power of the Commission to make an order forbidding its continuation. We have already seen to what extent the declaration of public policy, contained in the Sherman Act, permits a trader to go. The facts found show that the Beech-Nut system goes far beyond the simple refusal to sell goods to persons who will not sell at stated prices, which in the *Colgate Case* was held to be within the legal right of the producer.

The system here disclosed necessarily constitutes a scheme which restrains the natural flow of commerce and the freedom of competition in the channels of interstate trade which it has been the purpose of all the anti-trust acts to maintain. In its practical operation it necessarily constrains the trader, if he would have the products of the Beech-Nut Company, to maintain the prices "suggested" by it. If he fails so to do, he is subject to be reported to the company either by special agents, numerous and active in that behalf, or by dealers whose aid is enlisted in maintaining the system and the prices fixed by it. Furthermore, he is enrolled upon a list known as "Undesirable—Price Cutters," to whom goods are not to be sold, and who are only to be reinstated as one whose record is "clear" and to whom sales may be made upon his giving satisfactory assurance that he will not resell the goods of the company except at the prices suggested by it, and will refuse to sell to distributors who do not maintain such prices.

From this course of conduct a court may infer, indeed cannot escape the conclusion, that competition among retail distributors is practically suppressed; for all who would deal in the company's products are constrained to sell at the suggested prices. Jobbers and wholesale dealers who would supply the trade may not get the goods of the company, if they sell to those who do not observe the prices indicated or who are on the company's list of undesirables, until they are restored to favor by satisfactory assurances of future compliance with the company's schedules of resale prices. Nor is the inference overcome by the conclusion stated in the Commission's findings that the merchandising conduct of the company does not constitute a contract or contracts whereby resale prices are fixed, maintained, or enforced. The specific facts found show suppression of the freedom of competition by methods in which the company secures the coöperation of its distributors and customers, which are quite as effectual as agreements express or implied intended to accomplish the same purpose. By these methods the company, although selling its products at prices satisfactory to it, is enabled to prevent competition in their subsequent disposition by preventing all who do not sell at resale prices fixed by it from obtaining its goods.

Under the facts established, we have no doubt of the authority and power of the Commission to order a discontinuance of practices in trading, such as are embodied in the system of the Beech-Nut Company.

We are, however, of opinion that the order of the Commission is too broad. The order should have required the company to cease and desist from carrying into effect its so-called Beech-Nut Policy by coöperative methods in which the respondent and its distributors, customers and agents undertake to prevent others from obtaining the company's products at less than the prices designated by

it—(1) by the practice of reporting the names of dealers who do not observe such resale prices; (2) by causing dealers to be enrolled upon lists of undesirable purchasers who are not to be supplied with the products of the company unless and until they have given satisfactory assurances of their purpose to maintain such designated prices in the future; (3) by employing salesmen or agents to assist in such plan by reporting dealers who do not observe such resale prices, and giving orders of purchase only to such jobbers and wholesalers as sell at the suggested prices and refusing to give such orders to dealers who sell at less than such prices, or who sell to others who sell at less than such prices; (4) by utilizing numbers and symbols marked upon cases containing their products with a view to ascertaining the names of dealers who sell the company's products at less than the suggested prices, or who sell to others who sell at less than such prices in order to prevent such dealers from obtaining the products of the company; or (5) by utilizing any other equivalent coöperative means of accomplishing the maintenance of prices fixed by the company.

The judgment of the Circuit Court of Appeals is reversed, and the cause remanded to that court with instructions to enter judgment in conformity with this opinion.

*Reversed.*

MR. JUSTICE HOLMES, dissenting.

There are obvious limits of propriety to the persistent expression of opinions that do not command the agreement of the Court. But as this case presents a somewhat new field—the determination of what is unfair competition within the meaning of the Federal Trade Commission Act—I venture a few words to explain my dissent. I will not recur to fundamental questions. The ground on

which the respondent is held guilty is that its conduct has a dangerous tendency unduly to hinder competition or to create monopoly.  It is enough to say that this I cannot understand.  So far as the Sherman Act is concerned I had supposed that its policy was aimed against attempts to create a monopoly in the doers of the condemned act or to hinder competition with them.  Of course there can be nothing of that sort here.  The respondent already has the monopoly of its own goods with the full assent of the law and no one can compete with it with regard to those goods, which are the only ones concerned.  It seems obvious that the respondent is not creating a monopoly in them for anyone else, although I see nothing to hinder its doing so by conveying them all to one single vendee. The worst that can be said, so far as I see, is that it hinders competition among those who purchase from it.  But it seems to me that the very foundation of the policy of the law to keep competition open is that the subject-matter of the competition would be open to all but for the hindrance complained of.  I cannot see what that policy has to do with a subject-matter that comes from a single hand that is admitted to be free to shut as closely as it will.  And, to come back to the words of the statute, I cannot see how it is unfair competition to say to those to whom the respondent sells, and to the world, you can have my goods only on the terms that I propose, when the existence of any competition in dealing with them depends upon the respondent's will.  I see no wrong in so doing, and if I did I should not think it a wrong within the possible scope of the word unfair.  Many unfair devices have been exposed in suits under the Sherman Act, but to whom the respondent's conduct is unfair I do not understand.

MR. JUSTICE MCKENNA and MR. JUSTICE BRANDEIS concur in this opinion.

Mr. Justice McReynolds, dissenting.

With regret, I dissent from the opinion and judgment of the court.

This matter was submitted to the Commission upon an Agreed Statement of Facts, the twelfth clause of which—the last but one—declares: " 12. That the merchandising conduct of respondent heretofore defined and as herein involved does not constitute a contract or contracts whereby resale prices are fixed, maintained and enforced."

Of course, the Packing Company entered into this stipulation relying upon the quoted clause; and I am not at liberty either to disregard it or to minimize the plain import of its words. It is not a mere conclusion of the Commission but a definite and essential admission of record upon which the Company rested and without which I must conclude a different case might have been presented.

There is no question of monopoly. Acting alone, respondent certainly had the clear right freely to select its customers—to refuse to deal when and as it saw fit—and to announce that future sales would be limited to those whose conduct met with its approval. *United States* v. *Colgate & Co.,* 250 U. S. 300; *United States* v. *Schrader's Son, Inc.,* 252 U. S. 85; *Frey & Son* v. *Cudahy Packing Co.,* 256 U. S. 208.

If the solemn stipulation did not expressly negative the existence of contracts amongst the parties to maintain prices, I should think the detailed facts sufficient to support a finding that there were such agreements. But starting with that plain negation I can find no adequate ground for condemning the respondent.

The very order which the court below is now directed to enter conflicts with the stipulation between the parties by presupposing "methods of coöperation between respondent and the distributors of its products, especially the coöperative methods by which the respondent and the

distributors of its products undertake to prevent others from obtaining such products at less than the prices fixed by respondent, (by) the coöperation of customers in reporting the names of dealers who do not observe such resale prices with the view to prevent their obtaining the product of the Beech-Nut Company thereafter". How can there be methods of coöperation, coöperative methods, an undertaking to prevent others, or the coöperation of customers with a view to prevent others, when the existence of the essential contracts is definitely excluded?

Having the undoubted right to sell to whom it will, why should respondent be enjoined from writing down the names of dealers regarded as undesirable customers? Nor does there appear to be any wrong in maintaining special salesmen who turn over orders to selected wholesalers and who honestly investigate and report to their principal the treatment accorded its products by dealers. Finally, as respondent may freely select customers, how can injury result from marks on packages which enable it to trace their movements? The privilege to sell or not to sell at will surely involves the right by open and honest means to ascertain what selected customers do with goods voluntarily sold to them.

Under the circumstances disclosed, constraint upon the freedom of merchants can only result from withholding trade relations or threatening so to do. These, when acting alone, respondent may assume or decline at pleasure, there being neither monopoly nor attempt to monopolize. And the exercise of this right does not become an unfair method of competition merely because some dealers cannot obtain goods which they desire, and others may be deterred from selling at reduced prices. If a manufacturer should limit his customers to consumers he would thereby destroy competition among dealers, but neither they nor the public could complain.