A. H. GREBE & CO., Inc., v. SIEGEL.

(District Court, D. Rhode Island. July 29, 1926.)

No. 244.

Trade-marks and trade-names and unfair competition ☞68.

Radio set manufacturer *held* not entitled to preliminary injunction against removal of serial numbers from sets by price-cutting dealer.

In Equity. Suit by A. H. Grebe & Co., Inc., against Max Siegel, doing business as the City Hall Hardware Company. On plaintiff's motion for peremptory injunction. Motion denied.

W. H. C. Clarke, of New York City, for plaintiff.

Isadore S. Horenstein and Albert B. West, both of Providence, R. I., for defendant.

BROWN, District Judge. The plaintiff, a corporation of the state of New York, is engaged in the business of assembling and manufacturing radio sets, and sells its product to wholesalers, known as distributors, who in turn sell to the retail merchant.

The defendant conducts a general retail hardware business in the city of Providence.

The bill alleges that the defendant is a resident and inhabitant of the state of Rhode Island, but does not allege that he is a citizen of Rhode Island, unless inferentially in the allegation of paragraph 3:

"The jurisdiction of this court is invoked because this is an action between citizens of different states."

The answer admits this allegation.

The bill alleges that every radio set sold by the plaintiff has a number. The sets are numbered in the order of their production, and each number is a serial number, which is affixed before the set leaves the plaintiff's plant. Plaintiff keeps records with reference to each set, a description of the materials of which it is composed, names of the concerns from whom component parts were bought, names of plaintiff's workmen who assembled and manufactured the materials into the complete set, a description of the model, date of sale, selling price, and name of purchaser.

The defendant offers for sale and sells plaintiff's radio sets, from which the serial number has been removed or made permanently illegible by obliteration or mutilation.

It is evident that the serial number is not to be classed as a trade-mark, but is in the class of marks known as merchants' marks, or manufacturers' marks. The mark serves as a means of identification, and aids in the recovery of stolen instruments. The removal of the identifying mark, which individualizes the particular instrument, interferes with the plaintiff's business system.

The instruments are sold with a time guaranty of future service to owners of devices carrying serial numbers. The mark is also useful in the matter of repairs, checking up on workmanship, tests, etc. It is said

that this method of doing business also enables plaintiff in an inexpensive way to select its own dealers and customers, and confine its sales to those dealers who will charge enough to enable them to carry out full service to the plaintiff by pushing and advertising sales of the apparatus locally, and enables plaintiff to give aid to the user in respect to the working of the apparatus. The serial numbers assist in ascertaining what wholesalers and retailers cut prices. The plaintiff relies upon United States v. Colgate & Co., 250 U. S. 300, 39 S. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443.

Respondent admits that serial numbers may serve as a means of identification, that they may assist the complainant in its alleged desire for improvement and investigation, but avers that such objects are entirely subordinate to the chief and actuating motive for their attachment, namely, control and maintenance of prices

Defendant admits that he sold radio sets to the public with the serial number obliterated, without in any way altering the trademark and trade-name of complainant, and without in any way damaging said sets, either in operation or in appearance; that they were sold as new sets of complainant's make, and were such in fact, and not second-hand, stolen, or damaged sets; that he has pointed out to purchasers of such sets that serial numbers had been removed; and that such sets were bought with full knowledge. He distinctly asserts that such serial numbers were obliterated in order that the respondent might be able to continue to sell such sets at a price below the standard price fixed and maintained by complainant.

The answer alleges that by means of the serial numbers complainant is enabled to trace sets back to the jobbers, and cut off the supply of such retailers as do not maintain the standard price. The defendant relies upon decisions of the Supreme Court subsequent to the decision in U. S. v. Colgate, 250 U. S. 300, 39 S. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443.

Upon the question of whether a preliminary injunction should be granted, the chief practical question is as to the right of the defendant to deprive plaintiff of means of preventing further price-cutting by this defendant, and of cutting off supply from the dealers who are the source of defendant's supply. Upon this question the decision in Federal Trade Commission v. Beech-Nut Packing Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882, requires careful consideration. In that case, at page

452 (42 S. Ct. 154), the court, referring to the Colgate Case and other cases, said:

"By these decisions it is settled that in prosecutions under the Sherman Act a trader is not guilty of violating its terms who simply refuses to sell to others, and he may withhold his goods from those who will not sell them at the prices which he fixes for their resale. He may not, consistently with the act, go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade.

"The Sherman Act is not involved here, except in so far as it shows a declaration of public policy to be considered in determining what are unfair methods of competition, which the Federal Trade Commission is empowered to condemn and suppress."

The court said further:

"The order should have required the company to cease and desist from carrying into effect its so-called .Beech-Nut policy by co-operative methods, in which the respondent and its distributors, customers, and agents undertake to prevent others from obtaining the company's products at less than the prices designated by it—(1) by the practice of reporting the names of dealers who do not observe such resale prices; (2) by causing dealers to be enrolled upon lists of undesirable purchasers, who are not to be supplied with the products of the company unless and until they have given satisfactory assurances of their purpose to maintain such designated prices in the future; (3) by employing salesmen or agents to assist in such plan by reporting dealers who do not observe such resale prices, and giving orders of purchase only to such jobbers and wholesalers as sell at the suggested prices and refusing to give such orders to dealers who sell at less than such prices, or who sell to others who sell at less than such prices; (4) by utilizing numbers and symbols marked upon cases containing their products, with a view to ascertaining the names of dealers who sell the company's products at less than the suggested prices, or who sell to others who sell at less than such prices, in order to prevent such dealers from obtaining the products of the company; or (5) by utilizing any other equivalent co-operative means of accomplishing the maintenance of prices fixed by the company."

The dissenting opinion of Mr. Justice Holmes, concurred in by Mr. Justice McKenna and Mr. Justice Brandeis, states forci-

bly the same argument which the plaintiff now advances.

The dissenting opinion of Mr. Justice McReynolds points out that the order presupposes "methods of co-operation between respondent and the distributors of its products, especially the co-operative methods by which the respondent and the distributors of its products undertake to prevent others from obtaining such products at less than the prices fixed by respondent," etc.

It is important to give due effect to the words of the Supreme Court:

"By co-operative methods, in which the respondent and its distributors, customers, and agents undertake to prevent others from obtaining the company's products at less than the prices designated by it."

In the defendant's sworn answer appears the following allegation:

"That complainant is affiliated and acting in concert with a certain organization called the American Fair Trade League, which undertook to order the respondent to desist from the sale of sets without serial numbers, and demanding that respondent disclose to said league his source of supply, under threat of reporting him 'to the proper authorities.'"

Aside from this, and so far as the plaintiff's bill and affidavits show, the plaintiff is not using "co-operative methods" in the sense of co-operation with outside parties; but the decision of the Supreme Court seems to include in "co-operative methods" co-operation between the Beech-Nut Company and its own employees, who record or report price cutters, or who utilize numbers and symbols marked upon cases.

In "The Federal Trade Commission," by Gerard C. Henderson, Yale University Press, 1925, is the following comment on the Beech-Nut Company Case:

"It can hardly be denied that the decision leaves the law, in its practical aspects, in a very unsatisfactory state. A manufacturer may, in accordance with this decision, indicate, on the article or container, or otherwise, the price at which he expects the article to be resold. He may, it seems, announce to all distributors his expectation and desire that the price be adhered to. If it comes to his knowledge that a dealer is cutting prices, he may refuse to have further dealings with him, and may advise him or any one else of the reason. But apparently knowledge that the dealer has cut prices must come to the manufacturer spontaneously. He cannot instruct or request dealers, or even his own agents, to report the names of price cutters. Apparently, also, he must trust to his own memory as to the price-cutting proclivities of dealers; certainly he cannot cause their names to be 'enrolled upon lists,' and it would seem by analogy that entries on card records were likewise forbidden. Of course, numbers and symbols to assist in tracing shipments at cut prices are forbidden, as is 'any other equivalent co-operative means' of accomplishing the maintenance of resale prices. In other words, a system of price maintenance, enforced by a policy of refusing to sell to price cutters, is permitted, but modern business methods may not be used to make it effective."

In view of the very general practice among manufacturers of important articles in giving individual numbers to each one of their products, automobiles, watches, machinery, etc.; marks which enable interested parties to discuss a particular machine by its number rather than by a general name, the right of the manufacturer to the maintenance of these marks, even after he has parted with possession and title, presents an interesting question.

In the present case where it is said that the manufacturer guarantees the serviceability of his machine for a limited period, the serial number becomes a mark of liability, and it is important that he should have means of determining whether his liability still exists or has expired.

Manufacturers' marks individualizing machines give rise to questions quite different from the ordinary trade-mark questions. They are useful in many ways, other than in the matter of price-cutting. It seems hardly reasonable that a manufacturer's right to the use of serial numbers should be limited, in order to protect the interests of price cutters. Price cutters are not always of general benefit. They may be piratical, and inflict great harm upon legitimate trade for some comparatively unimportant advantage to themselves.

A manufacturer should not be deprived of legitimate benefits from the use of his individual serial marks, because they might also enable him to trace a price cutter. In the present case, however, the utility of these marks as an aid to the control and maintenance of prices is the principal consideration upon the question of granting a preliminary injunction. It does not appear that there is in any other respects urgency for relief before final hearing.

Recognizing the present views of the Supreme Court as expressed in the Beech-Nut Case, it cannot be said that the plaintiff's

right is clear in matter of law, or that the defendant's interference with plaintiff's trade is greater than has been permitted under that decision. See, also, John Moir et al. v. Federal Trade Commission (C. C. A. First Circuit, March 29, 1926) 12 F.(2d) 22.

It is suggested by the plaintiff that the present case involves merely a question of law upon facts which are established by bill and answer, and that this question of law may as well be disposed of at this time as reserved for final hearing.

In deference to the views of the majority of the court in the Beech-Nut Case, which I understand to apply to "co-operative methods" between a corporation and its agents and servants, as therein enumerated, I am constrained to decide that the plaintiff is not entitled to the equitable relief which it seeks. While this conclusion does not represent my own opinion on the merits, it apparently accords with the views of the majority of the members of the Supreme Court, to whose authority I must yield.

Petition for preliminary injunction denied.