**Samir A. DANOU, Plaintiff,**

v.

**KROGER COMPANY, an Ohio corporation, qualified to do business in Michigan, Defendant.**

**Civ. A. No. 80–72481.**

United States District Court, E.D. Michigan, S.D.

Feb. 28, 1983.

Peter P. Sudnick, Southfield, Mich., for plaintiff.

Timothy D. Wittlinger, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, District Judge.

This action involves defendant's alleged refusal to sell plaintiff the store fixtures located in a grocery store which defendant had leased from plaintiff. Plaintiff has filed a three-count complaint in connection with this alleged refusal.[1] Count I alleges that this refusal was a breach of contract. Count II alleges that defendant tortiously interfered with plaintiff's business relationships. Count III alleges that defendant and American Store Fixtures ("American") conspired to restrain trade, in violation of the Michigan antitrust statute. Mich.Comp. Laws Ann. §§ 445.701, 445.731.

Defendant subsequently moved for summary judgment. In a Memorandum Opinion and Order issued March 20, 1982, this Court granted summary judgment in favor of defendant as to Count II, but denied summary judgment as to Counts I and III. Defendant has now filed a renewed motion for summary judgment as to Count III. The parties have briefed the issues and have waived oral argument. For the following reasons, defendant's renewed motion is hereby granted.

In Count III, plaintiff alleges that defendant and American conspired to restrain trade, by refusing to sell plaintiff certain store fixtures without first removing them from the store. Prior to March 31, 1980, defendant leased a building in Detroit, Michigan from plaintiff and operated a grocery store in it. After receiving notice from defendant of its decision to terminate its occupancy, plaintiff sent defendant notice that the lease would be cancelled as of March 31, 1980. Plaintiff wished to operate a grocery store at this location once defendant had vacated the premises, and he sought to buy the store fixtures from defendant while they were still installed in the store. Indeed, plaintiff claims that a lease modification executed in 1974 required defendant to give plaintiff the first right to purchase these fixtures when the lease was cancelled.

The parties were unable to reach an agreement for the sale of these fixtures, however. Defendant then contracted with American to remove all of the fixtures and clean the store. Under this agreement, American was to leave the store in "broom clean" condition; in addition, American was to receive title to all of the fixtures once they were removed from the building.

During the time that American's employees were removing the fixtures and cleaning the store, plaintiff offered to purchase the fixtures in place from American. American maintained, however, that its contract with defendant required that the fixtures be removed from the store. In fact, American's vice-president, David Glass, called one of defendant's employees, Donald Plummer, to inform him that plaintiff wished to purchase the fixtures in place. Plummer told Glass that the fixtures could not be sold to plaintiff unless they were removed from the building. Although plaintiff did purchase some of the smaller fixtures from American, he was unable to purchase many of the larger fixtures which he wished to obtain. American removed all of these larger fixtures from the store; plaintiff eventually purchased fixtures elsewhere and opened a grocery store at this location.[2]

---

1. This complaint was originally filed in the Wayne County Circuit Court. Defendant removed the action to this Court, on the grounds that the parties are of diverse citizenship. 28 U.S.C. §§ 1332, 1441.

2. The facts as stated here are largely undisputed by the parties. They are also based in part on the deposition testimony submitted to the Court in this matter. *See* Deposition of Samir A. Danou at 67; Deposition of David Glass at 15; Deposition of Donald Plummer at 12.

Plaintiff claims that the agreement between defendant and American restrained trade in the sale of store fixtures, because it prevented him from purchasing the fixtures while they were still in place. He further claims that this agreement restrained trade in the retail grocery business, because the alleged refusal to sell these fixtures in place caused a three-month delay in his plans to open a grocery store at this location.

In its Memorandum Opinion and Order of March 20, 1982, this Court found that the agreement between defendant and American could be characterized as a restraint of trade if it stifled competition. The Court noted, however, that only unreasonable restraints of trade are actionable under the Michigan statute. The Court concluded that there was a factual question as to whether this agreement was unreasonable, and that summary judgment was therefore inappropriate.

In its renewed motion for summary judgment as to Count III, defendant argues that there was no concerted action in this case, and that it therefore did not violate the Michigan statute. As authority for this position, defendant has cited *Harold Friedman, Inc. v. Kroger Co.,* 581 F.2d 1068 (3d Cir.1978). Although decided long before defendant's earlier motion, *Friedman* was not cited by defendant in that motion. Defendant now argues that under the authority of *Friedman,* it is entitled to summary judgment as to Count III.

In response, plaintiff argues that the existence of concerted action in the case at bar is a question of Michigan law, and that *Friedman* is therefore inapplicable. Plaintiff further argues that defendant's failure to cite *Friedman* in its earlier motion was caused by its own inexcusable neglect, and that this renewed motion should be denied for that reason. Fed.R.Civ.P. 60(b).

▮ The Michigan antitrust statute is patterned after the Sherman Act. 15

U.S.C. § 1 *et seq.* Accordingly, the federal courts' interpretations of the Sherman Act are persuasive authority as to the meaning of the Michigan Act. *Goldman v. Loubella Extendables,* 91 Mich.App. 212, 283 N.W.2d 695 (1979). Nevertheless, Count III does allege a violation of state law, and the decisions of the Michigan courts are the controlling authority in seeking to interpret the Michigan statute. Therefore, the Court must look first to the Michigan cases to determine what degree of concerted activity is required under the Michigan statute.

As mentioned above, Count III alleges that defendant violated Mich.Comp.Laws Ann. §§ 445.701 and 445.731. These sections prohibit only concerted action in restraint of trade; they do not prohibit unilateral action. This concerted action requirement was explained in *Goldman v. Loubella Extendables, supra.* Plaintiff has excerpted a quotation from that case, and relies on it to argue that there is a material factual issue which precludes granting summary judgment in favor of defendant.[3] In order to apply *Goldman* correctly to the case at bar, however, the Court must examine the circumstances of that case. It is also necessary to examine the cases cited by the Michigan court in *Goldman,* so that the Court's observations may be placed in an appropriate context.

In *Goldman,* plaintiff operated a retail clothing store, and defendant was a clothing manufacturer. Plaintiff alleged that defendant and plaintiff's competitors had conspired to stop defendant's sales to plaintiff, because plaintiff was selling defendant's merchandise at a discount. The trial court granted summary judgment in favor of defendant, finding that plaintiff had presented no evidence of a conspiracy.

On appeal, the sole issue was whether defendant had conspired or combined with plaintiff's competitors, as required to establish liability under Mich.Comp.Laws Ann.

---

**3.** Quoting from *United States v. Parke, Davis & Co.,* 362 U.S. 29, 44, 80 S.Ct. 503, 512, 4 L.Ed.2d 505 (1960), the Michigan court stated: "[W]hen a manufacturer goes 'beyond mere announcement of his policy and the simple re-

fusal to deal, and he employs other means which effect adherence to his resale prices', he has put together a combination." 91 Mich. App. at 221, 283 N.W.2d at 699.

§ 445.701. The Michigan Court of Appeals reversed the trial court and remanded the case for trial. The court noted that defendant had indeed stopped selling its merchandise to plaintiff, without offering any explanation for its actions. There was also evidence that defendant had informed other retailers that it would not allow them to sell its merchandise at discounted prices, and that it had stopped selling its merchandise to any retailers that did not heed this warning. When defendant learned that other retailers were continuing to supply its merchandise to plaintiff, it had stopped selling to these other retailers as well. Finally, there was evidence that the retailers that were selling defendant's merchandise at full price had contacted defendant to complain about the retailers that were selling at a discount.

In light of these findings, the court concluded that there was some indication that defendant had combined with the non-discounting retailers, and that the complaints from these retailers had led defendant to stop selling to plaintiff and others. The court held that this presented a factual question which could not be resolved on a motion for summary judgment.

The Michigan court relied on four decisions of the United States Supreme Court which have explained the concerted activity requirement in § 1 of the Sherman Act. The leading case in this regard is *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). *Albrecht* involved a newspaper publisher's attempt to force distributors to adhere to a retail price set by the publisher. Plaintiff Albrecht distributed defendant's newspaper in a particular area of metropolitan St. Louis. When he raised his price above defendant's suggested resale price, defendant informed him that unless he lowered his price, defendant would take over his delivery route. Defendant hired Milne Circulation Sales, Inc. to solicit subscriptions from Albrecht's customers at defendant's lower price. Defend-

ant then hired George Kroner to deliver newspapers to the customers solicited by Milne. Kroner was required to comply with defendant's suggested resale price, and he knew that defendant would likely return his customers to Albrecht if Albrecht agreed to comply with this price as well.

The Court found that the agreement among defendant, Milne, and Kroner constituted concerted activity and that it violated § 1 of the Sherman Act. The Court noted that both Milne and Kroner knew that defendant's purpose in entering this agreement was to fix the retail price of its newspapers.

The Michigan court also cited *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). In that case, it was alleged that defendant had combined with retail and wholesale druggists to maintain the price of its pharmaceutical products. Defendant had announced a resale price maintenance policy in its wholesale and retail catalogs. Each of these catalogs contained a schedule of minimum prices to be charged. Nevertheless, certain retailers began to sell defendant's products at prices well below those listed in defendant's catalog. Defendant then informed its wholesalers that it would no longer sell its products to wholesalers who did not adhere to the catalog prices, nor to wholesalers who distributed these products to retailers who did not adhere to the catalog prices. Defendant also contacted its retailers directly, and informed them that neither defendant nor its wholesalers would sell to them if they did not observe the minimum prices.

Despite these warnings, several retailers continued to sell defendant's products at prices below the minimum prices. Defendant informed its wholesalers of this, and sales to these retailers were terminated.

The District Court found that defendant had not violated the Sherman Act, because it had acted unilaterally.[4] The Supreme

---

4. Under *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), a manufacturer may unilaterally enforce a price maintenance policy by announcing such a policy and refusing to deal with customers who do not observe it. So long as the manufacturer

Court reversed. It found that defendant had "employ(ed) other means which effect(ed) adherence to his resale prices", and had therefore not acted unilaterally. 362 U.S. at 44, 80 S.Ct. at 512. The Court found that there was a combination among defendant, its wholesalers, and its retailers to maintain the retail prices of defendant's products.

The third case cited by the Michigan court was *United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944). This case involved a business relationship between Bausch & Lomb and Soft-Lite Lens Co., Inc. Bausch & Lomb manufactured tinted optical lenses which it sold to Soft-Lite. Bausch & Lomb agreed to sell these lenses only to Soft-Lite; Soft-Lite agreed to buy them only from Bausch & Lomb. In addition, Bausch & Lomb was the majority shareholder in most of the wholesale companies through which Soft-Lite distributed these lenses to retail opticians.

Bausch & Lomb and the other wholesalers were allowed to sell the lenses only to retailers which had been licensed by Soft-Lite. Moreover, each pair of lenses was numbered so that Soft-Lite could determine which wholesalers had sold them to unlicensed retailers. Soft-Lite stated the price at which its wholesalers were to sell the lenses to retailers. Soft-Lite also forbade its retailers to sell the lenses for less than locally prevailing prices. Soft-Lite's salesmen and wholesalers policed the conduct of the licensed retailers. If retailers sold the lenses for less than Soft-Lite's stipulated price or otherwise violated the license granted by Soft-Lite, this was reported to Soft-Lite. Sales to these "undesirable" retailers were then terminated.

When charged with violating § 1 of the Sherman Act, Soft-Lite claimed that it had unilaterally refused to sell its lenses to retailers who failed to meet the terms of their licenses. The Court found that Soft-Lite had combined with Bausch & Lomb and its other wholesalers to fix resale prices and prevent sales to unlicensed retailers.

Finally, the Michigan court cited *F.T.C. v. Beech-Nut Packing Co.,* 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922). In that case, Beech-Nut circulated a list of uniform resale prices to its wholesalers and retailers. Beech-Nut informed its wholesalers and retailers that it would discontinue selling its products to anyone who failed to adhere to these prices. It also informed its wholesalers that it would discontinue its sales to any wholesaler which distributed its products to a retailer failing to adhere to the uniform prices. In addition, Beech-Nut placed code numbers on its products and instituted a reporting system to detect violations of its pricing policy.

The Court found that Beech-Nut, its wholesalers, and its retailers had combined to suppress price competition. The Court noted that Beech-Nut could have unilaterally refused to sell its products without violating the Sherman Act. The Court found, however, that by enlisting the cooperation of its wholesalers and retailers Beech-Nut had "(gone) beyond the exercise of this right." 257 U.S. at 453, 42 S.Ct. at 154.

The Court must now examine the alleged combination between defendant and American in the case at bar, and compare it to the concerted activity found to exist in *Goldman, supra,* and the cases cited therein.[5]

---

acts alone, this does not constitute concerted activity and therefore does not violate § 1 of the Sherman Act.

5. Defendant has cited *Harold Friedman, Inc. v. Kroger Co., supra,* a case in which the Third Circuit applied *Albrecht, supra,* under circumstances very similar to those in the case at bar. The Court in *Friedman* formulated a four-part test to determine whether concerted activity existed:

    (1) all members of the combination knew of the defendant's purpose to restrain trade; (2) at least two members of the combination benefited by the restraint of trade and, in that sense, shared a common purpose in restraining trade; (3) the agreement by two members of the combination actually restrained trade, as opposed to merely facilitating the restraint; and (4) at least two members of the combination intended to restrain trade.

For three reasons, the Court finds that the relationship between defendant and American was clearly different from the conduct which was found to constitute concerted activity in these other cases.

First, American derived no benefit from its role in this alleged combination. It would have been much more profitable for American to sell the fixtures in place, as requested by plaintiff. American could have resold the fixtures for a higher price if it had not first removed them. In addition, American could have saved itself the cost of removing the fixtures. Plaintiff has not even alleged that American would have benefitted from a restraint of trade in the retail grocery market; American has no interest in this market. If there was in fact a restraint of trade in the case at bar, it is clear that only defendant benefitted from it.

This is in marked contrast to the alleged circumstances in *Goldman* and the cases cited therein. In *Goldman,* defendant and the non-discounting retailers all benefitted from the restraint. Their actions suppressed price competition in the sale of defendant's products, which permitted all of them to sell these goods at a higher price. In *Albrecht,* Kroner clearly benefitted from defendant's restraint; he received newspaper customers as a direct result of this restraint. Milne also benefitted, by receiving its fee from defendant.

In *Parke, Davis* and *Beech-Nut,* the wholesalers and retailers involved benefitted from the price maintenance programs. Because they agreed to adhere to defendants' prices, they were assured of a continuing supply of defendants' products. In addition, they were able to sell these products at higher prices because of the price maintenance programs. The wholesalers in *Bausch & Lomb* similarly benefitted from their combination with Soft-Lite, because it allowed them to sell at higher prices.

Second, defendant's contract with American was clearly collateral to its alleged restraint of trade. American played no part in the alleged decision not to sell plaintiff the fixtures in place; it merely performed its contract with defendant. American made no direct contribution to defendant's alleged restraint. At most, American merely facilitated defendant's unilateral restraint by performing its contract and removing the fixtures from the building.

In contrast, the actions of the other retailers in *Goldman* were crucial for the success of defendant's refusal to deal with plaintiff. First, the non-discounting retailers also ceased selling goods to plaintiff when defendant informed them that plaintiff was selling these goods at discounted prices. Second, the non-discounting retailers complained to defendant that plaintiff was selling at a discount, and this led defendant to stop dealing with plaintiff.

Similarly, defendant's agreement with Kroner in *Albrecht* was an essential element in defendant's enforcement of its retail prices. Defendant would not have solicited Albrecht's customers unless it had made alternate plans for the delivery of its newspapers to these customers. Defendant's agreement with Milne may have been merely collateral and therefore insufficient, standing alone, to support a finding of combination. The Court in *Albrecht* did not indicate whether an agreement between defendant and Milne alone would have constituted concerted activity. It has been persuasively suggested that it would not have.[6]

581 F.2d at 1073. The Court's opinion is a perceptive analysis of *Albrecht's* concerted activity requirement; as will be discussed *infra,* the relationship between defendant and American clearly did not meet this four-part test. *Friedman* cannot be considered an important authority in the case at bar, however. Its four-part test has never been adopted by the Supreme Court, nor by many other federal courts. While *Friedman* has been frequently cited by the federal courts within the Third Circuit, it has rarely been cited by any others. It therefore cannot be regarded as the "leading authority in the country" which defendant claims it to be. Defendant's Brief at 3.

6. *See Friedman, supra,* 581 F.2d at 1073–1074:

[I]t is not clear from the *Albrecht* opinion whether the Supreme Court would have found concerted activity under § 1 based on the agreement between the Herald and Milne alone if the Herald had delivered the newspa-

In *Parke, Davis* and *Beech-Nut,* the assistance of the wholesalers and retailers was essential to the success of defendants' price maintenance programs. These wholesalers and retailers adhered to the resale prices set by defendants; in addition, they discontinued sales to other persons who did not adhere to these prices. The wholesalers in *Bausch & Lomb* also provided necessary assistance in implementing defendant's restraints. In addition to adhering to defendant's resale prices, they also policed the conduct of defendant's retailers and reported any violations of the retail licensing agreements.

Finally, American had no knowledge of defendant's alleged anticompetitive intent when it agreed to clean the store and remove the fixtures. Nothing in the deposition testimony submitted by the parties indicates that when American agreed to clean the store, it knew that defendant wanted to avoid selling the fixtures in place to plaintiff.[7] At most, plaintiff may be able to establish that American learned while it was cleaning the store that defendant would not allow plaintiff to purchase the fixtures in place.[8]

In *Goldman,* on the other hand, there was no question but that the non-discounting retailers knew of defendant's intent to maintain its resale prices. Defendant expressly told its retailers that it would not allow them to sell its merchandise at discounted prices. In addition, it stopped selling its merchandise to any retailer who did sell at a discount.

In *Albrecht,* the Court emphasized that both Milne and Kroner knew of defendant's intent to enforce compliance with its suggested retail prices.[9] In *Parke, Davis* and *Beech-Nut,* the wholesalers and retailers clearly knew of defendants' intent to maintain their resale prices; these defendants circulated uniform price lists to their wholesalers and retailers. In *Bausch & Lomb,*

---

pers itself and not hired Kroner. It would have been reasonable for the Court to have found that the Herald acted unilaterally in such a case, for in this hypothetical case only the Herald intended to restrain trade, only the Herald restrained trade, only the Herald stood to benefit from restraining trade, and no one shared with the Herald a common purpose of restraining trade. Professor Areeda also finds this position reasonable and suggests that a purely collateral agreement, such as that between Milne and the Herald, is insufficient to constitute concerted activity. . . . It seems to us, therefore, that Kroner's role in the combination was crucial to the outcome of the case.

Other commentators have also criticized the Court's conclusion in *Albrecht* that there was a combination among the Herald, Milne, and Kroner. *See The Supreme Court, 1967 Term,* 82 Harv.L.Rev. 63, 257–258 (1968):

Both Kroner and Milne were agents hired by the corporate defendant to perform specific tasks, in which they had no independent interests beyond the fee they were paid. It is difficult to find in this agency the "contract, combination in the form of·trust or otherwise, or conspiracy" that is required to violate section 1 of the Sherman Act. . . . Nor does there appear to be any economically significant difference between the defendant's hiring Milne to solicit the customers and its doing the job alone.

*See also* Handler, *Reforming the Antitrust Laws,* 82 Colum.L.Rev. 1287, 1299–1302 (1982):

[I]n *Albrecht* . . . the Court . . . extended section 1 to unilateral conduct by stretching the concept of concerted action well beyond the breaking point. . . . The courts of appeals have begun to interpret *Albrecht* properly to apply to cases involving concerted action, and not to those involving the mere "aiding and abetting" of a supplier's unilateral refusal to deal. . . . It is time for the Supreme Court to clarify *Albrecht* and explain that merely aiding and abetting a unilateral refusal to deal does not convert that unilateral conduct into a contract, combination, or conspiracy.

7. When a motion for summary judgment is supported by affidavits or depositions, an adverse party may not rely upon mere allegations. The adverse party must set forth facts to demonstrate that there is a genuine factual dispute. Fed.R.Civ.P. 56(e).

8. *See* Deposition of Donald Plummer at 12.

9. *See* 390 U.S. at 150, 88 S.Ct. at 872:

Milne's purpose was undoubtedly to earn its fee, but it was aware that the aim of the solicitation campaign was to force petitioner to lower his price. Kroner knew that respondent was giving him the customer list as part of a program to get petitioner to conform to the advertised price, and he knew that he might have to return the customers if petitioner ultimately complied with respondent's demands.

the wholesalers similarly knew that defendant sought to maintain its resale prices and prevent sales to unlicensed retailers.

In sum, the alleged conduct of defendant and American in the case at bar falls far short of the conduct found to constitute concerted activity in *Goldman, Albrecht, Parke, Davis, Bausch & Lomb,* and *Beech-Nut.* Measured against the conduct present in *Albrecht, Parke, Davis, Bausch & Lomb,* and *Beech-Nut,* the conduct of defendant and American was not concerted activity as that term has been defined under the Sherman Act. Moreover, the Michigan court expressly relied on those cases to formulate its definition of concerted activity in *Goldman.* Applying the *Goldman* test to the case at bar, therefore, the Court finds as a matter of law that there was no concerted activity under the Michigan antitrust statute. If there was any restraint of trade in the case at bar, it was caused by defendant's unilateral acts. Accordingly, defendant's renewed Motion for Summary Judgment as to Count III is hereby GRANTED.[10]

IT IS SO ORDERED.

---

**10.** Plaintiff has argued that defendant inexcusably neglected to raise the issue of concerted activity in its earlier motion for summary judgment, and that Fed.R.Civ.P. 60(b) mandates that this renewed motion be denied. Rule 60(b), however, applies only to a "final judgment, order, or proceeding." The denial of a summary judgment motion is an interlocutory order, and the Court can modify or rescind such an order at any time prior to the entry of a final judgment. *Bon Air Hotel, Inc. v. Time, Inc.,* 426 F.2d 858 (5th Cir.1970).