[No. 29939.   Department One.   August 1, 1946.]

J. W. RICHARDSON *et al., Appellants,* v. TAYLOR LAND AND LIVESTOCK COMPANY *et al., Respondents.*[1]

[1]Reported in 171 P. (2d) 703.

*Paul F. Scharpenberg* and *George H. Freese*, for appellants.

*Richard S. Munter* and *Edward G. Cross*, for respondents.

STEINERT, J.—Plaintiffs instituted action to compel defendants specifically to perform an alleged oral contract which by its terms required defendants to convey certain lands and assign their leasehold interests in other lands to the plaintiffs, in exchange for a tract of land owned by the plaintiffs and an agreed sum to be paid in cash by the plaintiffs to the defendants. In an amended complaint, plaintiffs sought the same relief or, in the alternative, recovery for damages alleged to have been sustained by them as a result of the defendants' refusal to perform the contract. The cause was tried to the court without a jury. At the conclusion of plaintiffs' evidence, the defendants moved that the action be dismissed. The court granted the motion and subsequently entered judgment of dismissal, but without prejudice to plaintiffs' undetermined right to institute an action for the recovery of the amount of certain expenditures made by them in the course of the alleged transaction. Plaintiffs appealed.

Appellants, J. W. Richardson and Blanche E. Richardson, husband and wife, live upon a ranch located near the town of Hooper, in Adams county, Washington, and are engaged in the livestock business. They own seven thousand acres of land situated in Adams county and also a one-half inter-

est in eight thousand other acres located partly in Adams county and partly in Whitman county. The Spokane, Portland and Seattle railroad, extending in a northeasterly-southwesterly direction in that vicinity, passes through these lands. That portion of appellants' holdings with which we are concerned in the present action comprises only about 320 acres lying west of the railroad right of way.

Mr. Richardson, who will hereinafter be referred to as though he were the sole appellant, is one of the directors of Northwest Livestock Production Credit Association, of Portland, Oregon. The association is engaged in the business of financing livestock production enterprises.

Respondent Taylor Land and Livestock Company, to which we shall hereinafter refer as the Taylor company, is a corporation and is also engaged in the livestock business. All of the capital stock of the corporation is owned by the estate of Alex T. McGregor, who died in January, 1945. During his lifetime, Alex T. McGregor was president and one of the trustees, or directors, of the company. The other trustees were Richard S. Munter and the respondent Gladys McGregor, wife of Alex T. McGregor. After Mr. McGregor's death, Mrs. McGregor was elected president and Mr. Munter secretary-treasurer of the corporation, and these two officers are the surviving members of its board of trustees. Mrs. McGregor is also the executrix of Alex T. McGregor's nonintervention will. The record does not disclose, however, who are the heirs named in that will or the persons beneficially interested in the capital stock of the Taylor company.

At the time involved in this action, the Taylor company owned extensive tracts of land adjoining appellant's land on the east side of the railroad right of way, and also held, under leases, a large amount of other land in the same vicinity. Upon these lands, the company periodically maintained large numbers of sheep.

More than twenty years ago, appellant entered into an oral agreement with Peter McGregor, the father of Alex T. McGregor and, at that time, the managing head of the Taylor company, by the terms of which agreement the

parties thereto exchanged between themselves the beneficial use of about a thousand acres of land owned by the one for an equivalent number of acres belonging to the other. That arrangement continued throughout the years, during the lifetimes of Peter McGregor and Alex T. McGregor, and until about May 6, 1945, which is the date whereon it is alleged the oral contract here in question was entered into by the parties, as hereinafter more particularly set forth.

Sometime in March, 1945, Mr. W. E. Williams, secretary-treasurer of Northwest Livestock Production Credit Association, called on respondent Gladys McGregor at her home on the Bar U ranch, which is a part of the Taylor company's holdings, and discussed with her a proposition involving the extension of a line of credit by the credit association to finance the livestock operations of the Taylor company. A loan was subsequently made to the company upon its note signed by its proper officers.

On or about May 4th or 5th, Mr. Williams again called on Mrs. McGregor, presumably in connection with that same matter. Just before seeing Mrs. McGregor on that occasion, Mr. Williams had met appellant in the town of Hooper and was, at that time, requested by the appellant to convey to Mrs. McGregor a proposal for the trade or exchange of certain portions of the lands held by them respectively. The testimony given by Mr. Williams on that subject was as follows:

"A. I told Mrs. McGregor that Mr. Richardson was interested in making a land trade. Mr. Richardson had given me the section numbers of certain land that was intermingled. . . . A. I told Mrs. McGregor that Mr. Richardson was willing to enter into a trade with her whereby the railroad tracks would be the boundary line. In the trade, they were to trade acre for acre up to the amount they each owned, and Mr. Richardson was willing to pay her $6 an acre for the excess land. Q. What was Mrs. McGregor's reply to this statement? . . . A. Her reply was that she thought she would be interested in that, and asked me to have Mr. Richardson contact her."

This proposal, if ultimately accepted, would have required appellant to transfer to the Taylor company the 320 acres of land lying on the west side of the railroad right of way and, in return, would have required the Taylor company to transfer to the appellant 1,570 acres situated on the east side of the railroad right of way. For the excess of 1,250 acres received by the appellant he would also have been required to pay to the Taylor company six dollars an acre, or a total amount of $9,420. Appellant also claimed in his complaint that, by the terms of the oral agreement, the land company was obligated to assign to him its leasehold interests in 1,280 acres which the company had been using in connection with its own lands.

Mr. Williams at once advised appellant of the result of his conversation with Mrs. McGregor. On the following day, May 6, 1945, appellant called at the Bar U ranch, where Mrs. McGregor was at the time busily engaged in shearing sheep at a place about a quarter of a mile distant from the dwelling place on the premises.

In the introductory part of the conversation, appellant made the statement that he would be interested in buying the yearling ewes if Mrs. McGregor would "trade and sell" the land to him. After spending some time in locating and inspecting the sheep, the parties repaired to the dwelling house to discuss the matter of the land. Appellant's version of the entire negotiations between him and Mrs. McGregor is contained in the following testimony given by him:

"A. We looked at the atlas [apparently a copy of portions of the Adams county plat book], and she wanted to know if I was still in the notion, or words to that effect, of trading and buying that land, as I had told Mr. Williams. I said I was, and she said, 'All right, we will trade.' Then we started on the sheep. Q. What took place in regard to the conversation about the sheep? A. I wanted to buy these sheep ten days after shearing, which was a natural practice in most cases. She was short of help, and agreed to sell them to me at what I had bid on them, [$9.00 a head] providing I would take them as soon as they were shorn. I told her I would, and did. Q. When did you take delivery of the sheep? A. On the 8th day of May. Q. At that

time, did you pay Mrs. McGregor any money? A. I did. Q. Showing you Plaintiff's [appellant's] Identification 2, tell the Court what that is. A. That is for $6,345 [check], and that is the notation on here that I put on. Q. Just what was that given to Mrs. McGregor for? The check will speak for itself. Is that your check? A. That is right. Q. And it was made payable to the Taylor Land & Livestock Company? A. That is right. Q. And has been endorsed? A. I don't know about that. Q. The endorsement is on the back of the check. A. I see an endorsement there, but it seems to be principally initialled. Q. That is the check that you gave her? A. That is right. [The check was thereupon admitted in evidence.]

"Q. . . . Do you remember when you gave that check to Mrs. McGregor? A. I gave it to her on the 8th day of May. Q. What was taking place at the time you gave her the check? What were you doing at the time you stopped in to give her the check? A. Stopped in for that specific purpose. Q. What were your men doing about that same time? A. Trailing the sheep home. Q. You mean the 705 head of yearling ewes you purchased at that time in connection with this deal? A. That is right. They were on their way then. Q. And you stopped in at the house to pay her for them? A. I did. Q. Did you tell her what you were paying the money for? Did you tell Mrs. McGregor at that time what you were giving her the money for? A. I was giving her the money in payment of the sheep. Q. In connection with a deal you had at that time? A. In connection with both deals. [Question held by the court to be leading.] Q. What was your conversation with Mrs. McGregor at that time, when you gave her the check? [Question objected to by respondent's counsel] Q. Just what took place there? Tell us what took place. A. That was a very few minutes, and she was quite busy with the shearing business, and I was busy myself, but it was thoroughly understood that it was in payment for the sheep. [Objected to by respondent's counsel.] Q. [By the court] What did you say to her, and what did she say to you? A. 'I am going to pay you for the sheep, and the land we will straighten out as quick as it is convenient on both sides.' Q. That is what you told her at that time? A. That is right. Q. And at the same time, you handed her this check? A. That is right. Q. What did she say to you in regard to the deal? A. Maybe it was a little ahead of the story there. The first deal was made—these deals were made and I offered to make her a down payment on both

land and sheep, and the answer I got was, 'I will trust you.' Q. And then what took place? Tell the rest of it. A. That was about all there was to it. We made the trade and we both understood it. We had looked at the atlas, understood it. Q. But she said, 'I will trust you?' Then you gave her this check that was introduced in evidence. A. That was two days before."

This testimony, when read casually, is a bit confusing, but a careful analysis of it makes it clear that the witness was testifying as to what took place on two separate dates. On the first occasion, May 6th, the parties in their discussion arrived at the point where Mrs. McGregor said, with respect to the lands, "All right, we will trade," and then immediately thereafter they concluded a deal for the sale and purchase of the sheep on the basis of nine dollars a head. At that time no payment was made by appellant. On the second occasion, two days later, May 8th, while the sheep were being taken away from the premises, appellant paid Mrs. McGregor, by check, the sum of $6,345, which covered exactly the purchase price of the sheep, 705 lambs at nine dollars a head.

Upon the issue of damages sustained by him, appellant testified that during the latter part of May, he expended $62.40 for repair of the railroad right of way fence abutting the property which Mrs. McGregor had agreed to sell to him, and the further sum of approximately ninety-five dollars for a policy insuring the grass on the Taylor company land.

A real estate agent, called as a witness by the appellant, testified that the 1,250 acres which it is alleged the respondent land company was obligated to convey to the appellant, over and above the 320 acres, were worth eleven dollars an acre, or five dollars an acre more than the alleged sale price; further, that the 1,280 acres upon which the land company held leases, were worth $3.50 an acre. The total damages claimed by the appellant for the alleged breach of the contract amounted to $9,695, of which all but approximately $157.40 was for alleged profit that appellant would

have realized on the purchase of the land had the contract been performed by respondents.

It is conceded that, sometime in June, Mrs. McGregor informed appellant that she would not perform the alleged contract with respect to the lands, and that the Taylor company refused to convey the lands to the appellant. In consequence of such refusal, appellant instituted this action.

Three questions are presented on the appeal: (1) whether the evidence was, by the required degree of proof, sufficient to establish the character, terms, and existence of the alleged contract; (2) if so, whether there was sufficient part performance of the contract by the appellant to remove the case from the operation of the statute of frauds; and (3) whether the evidence was sufficient to establish either an authority in Mrs. McGregor to enter into the contract for the sale of the land or else a ratification of the contract by the Taylor company.

Upon a careful study of the record, we have grave doubt that the first question above stated can be answered in the affirmative. However, for the purpose of this case, we will assume that the evidence was sufficient to prove that an oral contract as alleged by the appellant was entered into by respondent Gladys McGregor and the appellant. We therefore proceed to inquire whether there was part performance of that contract, sufficient to take the case without the operation of the statute of frauds.

█ Few, if any, subjects of the law have provoked as wide a discussion or received as expansive a consideration by the courts as has the so-called doctrine of part performance of oral agreements within the statute of frauds. While many courts have expressed a regret that the letter of the statute was ever departed from and the doctrine of part performance engrafted thereon, and while it has been said that the modern tendency is to maintain the substantial provisions of the statute according to its true spirit and purpose, nevertheless when it has come to either following or repudiating the doctrine *in toto,* the courts have, with few exceptions, felt themselves impotent to withstand the overwhelming current of authority sustaining its acceptance

and application. It is therefore now generally accepted that a sufficient part performance by the purchaser under a parol contract for the sale or exchange of real estate removes the contract from the operation of the statute of frauds and authorizes a court of equity to enter a decree of specific performance of the agreement by the vendor. *Jomsland v. Wallace,* 39 Wash. 487, 81 Pac. 1094; *Kennedy v. Anderson,* 49 Wash. 14, 94 Pac. 661; *Bendon v. Parfit,* 74 Wash. 645, 134 Pac. 185; *Manke v. Peterson,* 181 Wash. 185, 42 P. (2d) 39; Notes (1936) 101 A. L. R. 928.

■ The doctrine of part performance is, however, a purely equitable doctrine, having for its basis the conception that it would be a fraud upon the purchaser if the vendor were allowed to escape performance of his contract after the purchaser, relying upon the agreement, has done acts which have so altered the relations of the parties as to prevent their restoration to their former position.

The principle, as established by the cases, is set forth in 37 C. J. S. 755, Statute of Frauds, § 248, as follows:

"Although the doctrine is not everywhere recognized, it is well settled in most jurisdictions that, where one party to an oral contract has, in reliance thereon, so far performed his part of the agreement that it would be perpetrating a fraud on him to allow the other party to repudiate the contract and to set up the statute of frauds in justification thereof, equity will regard the case as being removed from the operation of the statute and will enforce the contract by decreeing specific performance of it."

With equal force and precision is the principle declared in 49 Am. Jur. 725, Statute of Frauds, § 421, in the following commentary:

"The true basis of the doctrine of part performance, according to the overwhelming weight of authority, is that it would be a fraud upon the plaintiff if the defendant were permitted to escape performance of his part of the oral agreement after he has permitted the plaintiff to perform in reliance upon the agreement. The oral contract is enforced in harmony with the principle that courts of equity will not allow the statute of frauds to be used as an instrument of fraud. In other words, the doctrine of part performance was established for the same purpose for which the statute

of frauds itself was enacted, namely, for the prevention of fraud, and arose from the necessity of preventing the statute from becoming an agent of fraud, for it could not have been the intention of the statute to enable any party to commit a fraud with impunity.

"As often stated, where one party to an oral contract for the sale of land has, in reliance on the contract, so far performed his part thereof that it would be a fraud upon him to allow the other party to repudiate the contract by invoking the statute of frauds, equity will regard the case as removed from the operation of the statute. It is not merely to remedy a possible loss to the plaintiff, or to prevent an unjust retention of benefit by the defendant who sets up the statute of frauds as a defense to an action on the contract after he has refused to perform it, that equity may intervene to decree specific performance in the case of land a contract which, although not in writing as required by the statute of frauds, has been partially performed by the plaintiff. Equity acts to decree specific performance because, by reason of the part performance, the relation of the parties has been changed and a restoration to their former condition would be impracticable, so that to refuse to execute the contract would amount to a fraud upon the plaintiff."

Many cases from different states, including our own, cited in support of the principle, will be found in 101 A. L. R. 935 *et seq.*

In *McKay v. Calderwood,* 37 Wash. 194, 79 Pac. 629, this court recognized as true the statement made by Mr. Pomeroy in his work on Specific Performance of Contracts (3d ed.) 255, § 106, that

"In every case where the doctrine of part performance has been applied, the elements of a constructive fraud will be found to exist, and in the absence of these elements equity always refuses to interfere. There must be acts of such a nature that the plaintiff cannot be replaced in his original position or adequately compensated in damages."

█ The principal elements or circumstances involved in determining whether there has been sufficient part performance by a purchaser of real estate under an oral contract otherwise within the statute of frauds, are (1) delivery and assumption of actual and exclusive possession of the land; (2) payment or tender of the consideration, whether in

money, other property, or services; and (3) the making of permanent, substantial, and valuable improvements, referable to the contract.

There is a wide diversity of opinion, as shown by the adjudicated cases, regarding the relative importance of these three elements. Where all three of them are united in a given instance, the strongest kind of case is thereby generally presented (*Bendon v. Parfit,* 74 Wash. 645, 134 Pac. 185), and, conversely, where none is shown, there is little to warrant a court of equity in decreeing specific performance. There is also a contrariety of opinion, as exemplified in the many cases on the subject, as to whether any single one of these elements is either an indispensable or an all-sufficient ingredient of part performance. As a matter of fact, in most of the cases where the doctrine of part performance has been successfully invoked, it will be found that at least two of the enumerated elements are present. It is also safe to say that of these elements, that of payment of consideration, when standing alone, is of less cogency than the others in determining whether there has been sufficient part performance to take the case without the operation of the statute of frauds. These several observations are fully confirmed by the encyclopedic treatises or restatements of the body of the law upon the subject, as found in 49 Am. Jur. 722 *et seq.,* Statute of Frauds, § 419 *et seq.;* 37 C. J. S. 755 *et seq.,* Statute of Frauds, § 248 *et seq.;* Notes (1936) 101 A. L. R. 923 to 1115.

■■ We can therefore assert with confidence that no positive rule has been, or can be, formulated for the government or decision of all cases indiscriminately, but that the determination of each case must depend upon the particular facts and circumstances involved therein. *Mobley v. Harkins,* 14 Wn. (2d) 276, 128 P. (2d) 289, 143 A. L. R. 88. However, the theory upon which all courts act in such cases is that it would be intolerable in equity for an owner of land knowingly to permit another to invest his time, labor, and money in that land upon the faith of a contract which did not exist.

■ With this understanding of the doctrine, we scrutinize appellant's claim of part performance, keeping in mind the three elements above mentioned, namely, possession, payment, and improvements made.

Respondent Gladys McGregor never delivered, nor did the appellant ever take, actual, exclusive, or any, possession of the Taylor company land, or any part thereof. It is not disputed that Mrs. McGregor, either individually or as president of the Taylor company, at all times involved herein exercised continuous and exclusive possession of the land which the appellant now seeks to acquire. The only times that appellant was ever upon the land, either in person or through his agents, during the period here in question were when he was consulting Mrs. McGregor with reference to the purchase of the land and sheep, or when the sheep were being trailed from the ranch, or when the repair of the fences, to which we will later refer, was being made. By all of the authorities, possession is an important, even though not invariably an indispensable, element in the part performance of an oral contract for the sale of land. In this case, no possession in any real sense was ever relinquished by the respondents, or taken by the appellant. That element is therefore eliminated from further consideration.

■ We next inquire into the element of payment. This court has uniformly held that payment of the purchase price, in whole or in part, is not of itself a sufficient part performance to remove an oral agreement for the sale of land from the operation of the statute. *Chamberlain v. Abrams,* 36 Wash. 587, 79 Pac. 204; *Thill v. Johnston,* 60 Wash. 393, 111 Pac. 225; *Trimble v. Donahey,* 96 Wash. 677, 165 Pac. 1051.

■ The evidence in the instant case, as quoted above, establishes the fact that the appellant paid nothing whatever on the purchase price of the land. By his own testimony, the check for $6,345 which he gave to Mrs. McGregor was in full payment for the sheep only, and no part thereof was for the land; nor did appellant convey to the respondent land company the 320 acres which, under the terms of the alleged contract, he was required to convey.

Appellant's claim upon this phase of the case seems to be that a condition of his purchasing the sheep was that he was to acquire the land, and that he would not have purchased the sheep except upon that condition. Appellant makes no claim that he sustained any loss by reason of his purchase of the sheep. They were sold to him at the price which he offered, and, in the absence of any evidence to the contrary, it may fairly be presumed that he made a profit on them, or at least sustained no loss. In other words, appellant has shown no detriment to him resulting from the purchase of the sheep. We find no element of payment sufficient to take the case out of the operation of the statute.

█ We then come to the element of improvements. It is a settled proposition that not all improvements or repairs, of however little value, will entitle a vendee to specific performance of a parol contract for the sale of real estate, but, to constitute a sufficient part performance, the improvements must be permanent, substantial, and valuable. 37 C. J. S. 769, Statute of Frauds, § 252; 49 Am. Jur. 755, Statute of Frauds, § 44; Notes (1936) 101 A. L. R. 1067; *Marshall v. Hillman Inv. Co.*, 151 Wash. 529, 276 Pac. 564.

In the case at bar, appellant made no improvements whatever upon the land under consideration. All that he did was to repair a fence which was not upon the land of the respondents, but was simply a part of the railroad company's right of way fence; nor was this done in fulfillment of any requirement of the contract. Moreover, the amount thus spent was insignificant in comparison with the amount involved in the transaction. Furthermore, it was an item for which appellant could readily be reimbursed, if the court should find that, under the circumstances, he was entitled to such reimbursement. This last statement is equally true of appellant's expenditure of ninety-five dollars for a policy of insurance relating to the grass on the land. The element of improvements therefore disappears from the case.

█ It is thus apparent that appellant has not established a single one, much less a combination of two or more, of the elements of part performance under which a court of equity may hold that a given case is taken without the

operation of the statute of frauds. The cases cited by appellant present situations where at least one, and in most instances two or more, of the enumerated elements were shown. Those cases are not applicable here, where all of those elements are lacking.

As to the alleged damages of $9,695, less approximately $157, appellant's claim is that this amount would have been his profit had the contract been performed by the respondents.

In no event could such damages be recovered in a case of this kind. Where services have been performed or improvements have been made upon land by a purchaser under a contract which is within the statute of frauds, the measure of recovery is the reasonable value of the benefits conferred upon the owner of the land, not the loss of profits sustained by the adversary party by reason of his failure to obtain the land. *Chamberlain v. Abrams,* 36 Wash. 587, 79 Pac. 204; *Johnson v. Upper,* 38 Wash. 693, 80 Pac. 801; *Peterson v. Nichols,* 110 Wash. 288, 188 Pac. 498; 49 Am. Jur. 879, Statute of Frauds, § 572; 37 C. J. S. 777, Statute of Frauds, § 255.

There can be no recovery of damages for breach of contract unless there is an enforcible contract, and, unless there is such valid contract, there can arise no action for its breach. *Chamberlain v. Abrams, supra; Goodwin v. Gillingham,* 10 Wn. (2d) 656, 117 P. (2d) 959; Notes (1929) 59 A. L. R. 1305. In this instance, there is no enforcible contract, and hence there can be no recovery for loss of profits resulting from its alleged breach.

Appellant next contends that Mrs. McGregor, as president and manager of the Taylor company, had authority to enter into the contract for the sale of the land, or else that the respondent land company is estopped to deny the validity of the contract because it received and accepted the check for $6,345 which had been delivered by the appellant to Mrs. McGregor, and thereafter applied the proceeds thereof in payment of the company's indebtedness to the Northwest Livestock Production Credit Association.

■ Mrs. McGregor was the president and one of the trustees of the land company. As manager in charge of its livestock operations, she may have had at least implied or apparent authority to sell the sheep. No question is here raised as to her authority in that respect. However, her position as president did not, of itself, confer upon her the authority to sell the lands belonging to the corporation, nor did she have, as trustee, any greater power than any other trustee had. The land company was not engaged in the business of selling lands, but simply in producing and selling livestock. Any authority which Mrs. McGregor exercised in the sale of the lands would have to be expressly conferred upon her by the charter, by-laws, or trustees of the company, or be implied from express powers, or from usage, custom, or the nature of the company's business. *Reuter Organ Co. v. First Methodist Episcopal Church,* 7 Wn. (2d) 310, 109 P. (2d) 798; *Betz v. Tacoma Drug Co.,* 15 Wn. (2d) 471, 131 P. (2d) 183; 19 C. J. S. 97, Corporations, § 752; 13 Am. Jur. 878, Corporations, § 898. No proof of authority from any of such sources was offered by the appellant.

■ In considering the question of ratification, it must be remembered that the amount of the check above referred to covered exactly the purchase price of the sheep, and that it was definitely understood between appellant and Mrs. McGregor that it was for that purpose only. There is no convincing evidence that either she or the trustees of the company ever had any idea that, as appellant now seems to contend, the check was given, or was to be applied, upon the purchase price of both the land and the sheep. There is no evidence that the other officers or trustees of the company ever had any knowledge of the alleged oral contract between appellant and Mrs. McGregor. The acceptance and application of the check by the land company under such circumstances would not amount to a ratification of the alleged contract for the sale of the land. As stated before, there is no question here as to any claimed loss to the appellant by reason of the purchase of the sheep. So far as the record discloses, that was a profitable transaction for the appellant.

■ Finally, appellant complains that the trial court did not allow him reimbursement for the expenditures made by him, amounting to approximately $157. In dismissing the action, the court did, however, save to the appellant any right of action which he might have for such reimbursement.

The court could, of course, have granted to appellant such recovery in the pending action, if it had seen fit to do so. However, the court was not compelled to take that course. It had the right to remit the appellant to an action for that limited purpose, and it did save to him all of his rights in that respect. We perceive no abuse of discretion in pursuing that course.

The judgment is affirmed.

BEALS, C. J., MILLARD, SIMPSON, and MALLERY, JJ., concur.