[No. 4979–1.   Division One.   April 17, 1978.]

RONALD L. WAGERS, ET AL, *Appellants,* v. ASSOCIATED MORTGAGE INVESTORS, *Respondent.*

*Robert H. Stevenson,* for appellants.

*Short, Cressman & Cable* and *John H. Strasburger,* for respondent.

DORE, J.—Plaintiff Ronald L. Wagers sought specific performance of an alleged agreement to purchase real estate lots in Kent, Washington, or, in the alternative, for damages for breach of the agreement. Defendant Associated Mortgage Investors (hereinafter called AMI) moved to dismiss the plaintiff's first cause of action for specific performance which the court treated as a motion for summary judgment. The trial court entered partial summary judgment as a final judgment dismissing plaintiff's first cause of action for specific performance. The judgment further provided that the order of dismissal "would be deemed a final judgment pursuant to CR 54," the court finding that there was no just reason for delay.

Plaintiff appeals.

FACTS

Plaintiff Wagers was a building contractor with offices in Federal Way, Washington. In the spring of 1975 Wagers commenced negotiations with Tom Benkert, a representative of AMI in Coral Gables, Florida, for the purchase of 104 building lots near Kent, Washington. Negotiations for the sale took place over a period ranging from the spring of 1975 through April of 1976. Benkert indicated that his principal (AMI) owned and controlled the property and had the power to sell to anyone it chose. There was some mention of other persons having an interest in the property but plaintiff was assured that AMI had the authority to make the sales as long as agreeable terms were reached. That on February 9, 1976, Wagers submitted an earnest money agreement to AMI to purchase the lots for $250,000 cash.

After Wagers mailed the executed earnest money agreement to AMI he continued to inquire as to when approval would be forthcoming. On March 29, 1976, Benkert telephonically advised plaintiff that the board of trustees of AMI had approved the earnest money agreement for an amended total cash sales price of $270,000. He further stated the signed earnest money agreement would be immediately returned to plaintiff through AMI's attorney in Seattle. In this conversation plaintiff was informed that there was only "one slight problem" with an individual who was "hedging a bit for more money on settlement of AMI from the sale proceeds; it was a matter of internal handling, however, and would not delay the close of the sale."

In a letter dated March 30, 1976, AMI's Seattle attorney wrote to plaintiff's attorney as follows:

Dear Mr. Stevenson:

Associated Mortgage Investors has indicated to us that the proposed sale to Mr. Wagers for $270,000—$10,000 as forfeitable earnest money with the balance to be paid in cash within 90 days if the necessary financing can be arranged—is acceptable to AMI *subject to prior approval by its trustees and subject to its ability to arrange* for delivery of clear title. AMI is governed by its

Board of Trustees and must have approval of the Board before it can sell the property. However, AMI's officers are confident that the trustees will approve the sale.

Concerning the problems of clearing title, we attempted to explain to you during our recent phone conversation some of the complexities of the case. These complexities result in delay, but we do not anticipate any particular problem. On March 17, 1976, we wrote to the various parties having an interest in the property outlining the terms of the proposed sale and suggesting a division of the proceeds. We requested a response by Monday, March 29, 1976. All except one of the parties have now responded by indicating that the proposal is acceptable. The one remaining party has indicated that he is undertaking certain steps to determine whether the sale price is reasonable and has promised to respond by Monday, April 5, 1976.

Thus, although we cannot promise that the proposed transaction will be closed, we are undertaking our best efforts to obtain the necessary approvals, and it is AMI's intent to sell the property to Mr. Wagers on the terms indicated if it can successfully arrange to clear title on terms acceptable to AMI.

/s/ John H. Strasburger

(Italics ours.)

A few days later on April 6, 1976, the attorney for the plaintiff acknowledged Strasburger's letter of March 30 and wrote:

Dear Mr. Strasburger:

Thank you for your letter of March 30, 1976 concerning the *sale* of the above realty by your client, Associated Mortgage Investors (AMI), to Ron Wagers, my client.

Your letter confirms Wagers' understanding with Mr. Tom Benkirk [*sic*], agent for AMI in Coral Gables, Florida, that the above described realty is *sold* to Wagers for $270,000.00, all cash on closing with $10,000.00 down, pending clearance by you of free title. The *sale* is to be closed at Pioneer National Title Insurance Company here in Seattle under appropriate escrow instructions and within 90 days of AMI furnishing the preliminary title report.

You are proceeding to clear the title and will advise me when this has been accomplished—hopefully within the next week.

Relying on the above, *Wagers is proceeding to obtain the necessary funds for payment and preparing plans and schedules for completion of the tract.*

Tom Benkirk [*sic*] advised Wagers in a phone conversation on March 29, 1976 that the *trustees of AMI had approved the terms of the above described sale.* Therefore, please have the earnest money now in the hands of AMI executed and forwarded to me for my file and for Pioneer National Title Insurance Company. Also, forward to me AMI's appraisal on the property and engineer's report as promised by Tom Benkirk [*sic*].

Wagers advises that there may be a problem of the ownership of Lots 1 through 7 by AMI. He discussed this with Tom Benkirk [*sic*] who has agreed, if there is no ownership, to reduce the total sales price of $270,000.00 by $18,173.05 for the loss of the seven lots. This amount was arrived at by dividing $270,000.00 by 104 lots which gives a price of $2,596.15 for each lot or a total of $18,173.05.

Please advise me when this sale can be moved into closing.

/s/ Robert H. Stevenson

(Italics ours.)

AMI's Seattle counsel, upon receiving the above letter and obviously disagreeing, responded the following day April 7, 1976, as follows:

Dear Mr. Stevenson:

We have received your letter of April 6, 1976. As we stated in our prior letter, *it is not my understanding that the trustees have approved the sale since an agreement has not yet been received from all of the parties who have an interest in the property* concerning the sale and the proposed sale cannot be approved by the trustees until formal agreement has been received. We have contacted four different individuals connected with the property. Three have indicated that the sale appears to be acceptable. The fourth is still questioning the reasonableness of the sale price, but it appears that they will also consent. However, when we informed them of the

sale, we stated that the sale price was $270,000. Your letter indicates that the sale price has been reduced. If this is the case, it will be necessary to recontact each of the individual parties.

We are concerned that your letter may be designed to render AMI liable for any financing and other costs incurred by Mr. Wagers if the property is not sold to Mr. Wagers. Therefore, we wish to clarify that although AMI is interested in Mr. Wagers' offer, he is proceeding at his own risk and AMI will not be responsible for any expenses he may incur. *Specifically, your letter indicates that you are confirming Mr. Wagers' understanding that the property has been "sold to Wagers." If this is Mr. Wagers' understanding, it is incorrect.* As previously indicated, any sale to Mr. Wagers is contingent upon approval of the Board of Trustees of AMI and approval of each of the individuals who have an interest in the property. We are continuing to exert our best efforts to obtain the necessary approvals on terms acceptable to AMI. *Until these necessary approvals on terms acceptable to AMI's trustees have been obtained, there is no binding and enforceable agreement.*

As we have previously indicated, AMI's officers are acting in good faith, but we felt it necessary to write this letter since your letter implied that the negotiations had now resulted in a binding agreement which is not yet the case.

/s/ John H. Strasburger

(Italics ours.)

## Issues

1. Whether plaintiff's unilaterally executed earnest money agreement, together with the letters exchanged between the parties' respective attorneys, constitute a sufficient writing of a sale of land to satisfy the statute of frauds?

2. Whether plaintiff's arrangement of financing for development of the subject of the sale constituted sufficient part performance to make the sale an exception to the statute of frauds?

## DECISION

ISSUE 1:

Sales of land to be enforceable must ordinarily be in writing signed by the party to be charged. However, a writing is not always essential to the validity of the contract. An oral agreement can be equally effective and binding as a written one when the terms are reasonably established in writing by a series of documents and/or written memorandum which would establish the subject matter, consideration, identity of the parties and the terms of the agreement.

Plaintiff argues that the statute of frauds may be satisfied by various kinds of written memorandum. It may consist of one writing or several writings. It may also be pieced together out of separate writings since all that the statute requires is written evidence on which the whole agreement can be made out. Restatement of Contracts § 208 (1932); *Western Timber Co. v. Kalama River Lumber Co.,* 42 Wash. 620, 85 P. 338 (1906); *Alexander v. Lewes,* 104 Wash. 32, 175 P. 572 (1918). Plaintiff contends that the earnest money agreement signed by Wagers and the letter of defendant's attorney under date of March 30, 1976, together with plaintiff's attorney's answering letter of April 6, 1976, supplies the necessary written information to satisfy the statute of frauds.

Plaintiff and his attorney at all times were advised that the purchaser's earnest money agreement was subject to approval of the board of trustees as well as its ability to arrange for delivery of clear title.

Strasburger's letter of March 30 was written 1 day after plaintiff's earnest money agreement had expired without being accepted, signed and returned. His letter is replete with statements that the subject earnest money agreement was contingent upon the approval of the board of trustees and that there were a number of indications that there was pending trouble with clearing title. At this juncture plaintiff's attorney was obviously disturbed and tried to turn a unilaterally executed earnest money agreement into a consummated sale by answering Strasburger's letter referring

to "the sale of the above realty by your client Associated Mortgage Investors to Ronald Wagers, my client." It is clear to the court that on April 6, 1976, plaintiff's attorney was still unsure as to the subject matter of the sale and was trying to establish a formula for reduction of the amount of the total purchase price in the event that title to seven lots might not be cleared. It may well be that the seven deleted lots were far more valuable than the remaining lots and there is no indication that the lots were of the value of $2,596.15 each, as provided for in plaintiff's letter.

Apparently the next day when defendant's attorney received plaintiff attorney's letter of April 6, he immediately responded in his letter of April 7, 1976, wherein he stated in no uncertain terms that the sale had not been approved and again stating that one of the tenants in common was questioning the reasonableness of the sale price. He further stated that in the event the sale price of $270,000 was to be reduced it would again require approval from all of the owners. In the same letter he also cautioned plaintiff's attorney not to incur any expenses on the basis that the sale had been consummated.

We hold that the buyer's unilaterally executed earnest money agreement, together with the letters exchanged between the buyer's and seller's attorneys, fail to establish an agreement between the parties on essential contract terms and, therefore, did not constitute a sufficient writing to satisfy the statute of frauds.

ISSUE 2:

■ Part performance is a recognized exception of the requirement of the statute of frauds. One of the requirements of the doctrine of part performance is that the acts relied upon as constituting part performance must unmistakably point to the existence of the claimed agreement. If they may be accounted for by some other hypothesis they are not sufficient. *Granquist v. McKean,* 29 Wn.2d 440, 187 P.2d 623 (1947).

■ The statute of frauds is a positive enactment to the effect that contracts of this nature to be valid and enforceable must be in writing. Courts of equity have no right any more than courts of law to disregard the statute except where it is necessary to do so in order to prevent a gross fraud from being practiced. *Granquist v. McKean, supra.*

■ In *Richardson v. Taylor Land & Livestock Co.,* 25 Wn.2d 518, 171 P.2d 703 (1946), the principal elements involved in determining part performance are elucidated at page 528:

The principal elements or circumstances involved in determining whether there has been sufficient part performance by a purchaser of real estate under an oral contract otherwise within the statute of frauds, are (1) delivery and assumption of actual and exclusive possession of the land; (2) payment or tender of the consideration, whether in money, other property, or services; and (3) the making of permanent, substantial, and valuable improvements, referable to the contract.

There is a wide diversity of opinion, as shown by the adjudicated cases, regarding the relative importance of these three elements. Where all three of them are united in a given instance, the strongest kind of case is thereby generally presented (*Bendon v. Parfit,* 74 Wash.. 645, 134 Pac. 185), and, conversely, where none is shown, there is little to warrant a court of equity in decreeing specific performance. There is also a contrariety of opinion, as exemplified in the many cases on the subject, as to whether any single one of these elements is either an indispensable or an all–sufficient ingredient of part performance. As a matter of fact, in most of the cases where the doctrine of part performance has been successfully invoked, it will be found that at least two of the enumerated elements are present. It is also safe to say that of these elements, that of payment of consideration, when standing alone, is of less cogency than the others in determining whether there has been sufficient part performance to take the case without the operation of the statute of frauds. These several observations are fully confirmed by the encyclopedic treatises or restatements

of the body of the law upon the subject, as found in 49 Am. Jur. 722 *et seq., *Statute of Frauds, § 419 *et seq.;* 37 C.J.S. 755 *et seq.,* Statute of Frauds, § 248 *et seq.;* Notes (1936) 101 A.L.R. 923 to 1115.

We can, therefore, assert with confidence that no positive rule has been, or can be, formulated for the government or decision of all cases indiscriminately, but that the determination of each case must depend upon the particular facts and circumstances involved therein.

*See also Thompson v. Hunstad,* 53 Wn.2d 87, 91, 330 P.2d 1007 (1958), wherein it was stated on page 91:

One of the requirements of the doctrine of part performance is that the acts relied upon as constituting part performance must unmistakably point to the existence of the claimed agreement. If they may be accounted for on some other hypothesis, they are not sufficient.

The only act of "part performance" alleged by appellant is contained in Mr. Wagers' affidavit in which he states:

Affiant told Mr. Beukert [*sic*] that he was arranging for the financing of the sale and wanted to start breaking ground as soon as possible.

. . .

In reliance on these conversations, affiant made arrangements for financing this sale with Citizens Federal Savings & Loan in Seattle.

We have none of the three principal elements or circumstances in this case to constitute part performance. At best we have arrangement for financing which presumably had been arranged or provided for before the earnest money agreement was signed. In any event the arrangement for financing was equally consistent with the earnest money agreement or with the decision to make an offer to increase the purchase price rather than a sale. We hold there was no part performance by the plaintiff to constitute an exception to the statute of frauds.

The doctrine of equitable estoppel is not applicable in this case.

Judgment affirmed.

ANDERSEN and RINGOLD, JJ., concur.

Reconsideration denied September 12, 1978.