**GLACIER OPTICAL, INC., a Washington corporation, Plaintiff,**

**v.**

**OPTIQUE DU MONDE, LTD., a Delaware corporation, and Safilo America, Inc., a Delaware corporation, Defendants.**

Civ. No. 91–985–FR.

United States District Court, D. Oregon.

March 15, 1993.

 

Christopher James, J. Richard Urrutia, Susan D. Marmaduke, James, Denecke & Harris, Bruce M. Hall, Bruce MacGregor Hall, P.C., Portland, OR, for plaintiff.

Wayne Hilliard, Robert W. Roley, Lane Powell Spears Lubersky, Portland, OR, Donald H. Rivkin, Schnader, Harrison, Segal & Lewis, New York City, for defendants.

## OPINION

FRYE, District Judge:

The matters before the court are 1) defendants' motion for summary judgment (#107); and 2) plaintiff's motion for partial summary judgment (#114).

### UNDISPUTED FACTS

Plaintiff, Glacier Optical, Inc. (Glacier), is a Washington corporation with its headquarters in Woodenville, Washington. Defendant Optique Du Monde (ODM) is a Delaware corporation with its headquarters in the State of New York. ODM transacts business in the State of Oregon. Defendant Safilo America, Inc. (Safilo America) is a holding company for the Safilo Group, an Italian company. Safilo America is a Delaware corporation which wholly owns Safilo USA. Safilo USA, which is not a defendant in this action, sells eyewear to optometrists, opticians and ophthalmologists. Safilo USA was and is a competitor of ODM.

Safilo America and ODM have a number of directors in common. The board of directors of Safilo America is responsible for the philosophy, image and future direction of the Safilo Group in the United States, including ODM. Safilo America maintains that it does not exert control over the management or operation of ODM.

ODM is a United States licensee for the manufacture and sale of eyeglass frames bearing the trademarks, Ralph Lauren and Polo. ODM sells Ralph Lauren/Polo eyewear to large retail optical chains, such as Pearle and Lenscrafters. ODM has more than twenty distributors in the United States. Glacier was a distributor for ODM until it was terminated.

In April, 1987, Espe Buono, vice president for sales for ODM, met twice with representatives of Glacier in Seattle, Washington. During these two meetings, there was no discussion as to a specific volume of sales which the parties expected to be sold by Glacier. As a result of the meetings, Glacier began distributing Ralph Lauren/Polo eyewear, as well as other brands of eyewear which ODM distributes. Glacier and ODM did not enter into a written distribution agreement, however, in April, 1987, Glacier made sales primarily to optometrists, ophthalmologists, and retail opticians in the States of Oregon, Washington, Idaho, Alaska, Montana, and Utah. In April, 1987, ODM did not have adequate representation in the Northwest.

In late 1987, Glacier began selling eyewear to Costco, a "members only" warehouse sales organization.

In 1988, Safilo America bought ODM and acquired the licenses of ODM.

In March, 1989, there was a meeting which was attended by ODM, distributors of ODM products, and George Rich, a representative of Safilo America. The distributors of ODM products were concerned that Safilo America might start selling Ralph Lauren/Polo eyewear directly through Safilo USA and bypass them.

In the spring of 1990, Glacier began selling to Shopko, a department store chain with its headquarters in Green Bay, Wisconsin, and to Wal–Mart, a retailer with its headquarters in Bentonville, Arkansas. Costco, Shopko and Wal–Mart are not optometrists, ophthalmologists, or retail opticians.

Throughout 1990 and 1991, a substantial majority of the business of Glacier was conducted with Costco, Shopko and Wal–Mart.

ODM periodically distributes a suggested resale price list for Ralph Lauren/Polo eyewear. ODM does not require that its distributors adhere to the suggested resale price list.

ODM was aware that Glacier sold Ralph Lauren/Polo eyewear to Costco, Shopko and Wal–Mart, which are merchandisers who attempt to "undersell" their competitors. Some distributors of ODM eyewear, including Jack Hodes and Continental Eyewear (ODM's wholly-owned subsidiary), as well as Ray Arndt, Target Optical, and Optical Sales, complained to ODM about its sales of Ralph Lauren/Polo products to volume discounters, such as Costco, Shopko and Wal–Mart.

ODM made its distributors aware of its policy that Ralph Lauren/Polo eyewear would not be sold to volume discounters and to other distributors. Herman T. Petersen, vice president of ODM, specifically told a non-complying distributor, Robert M. Press, that he could not sell to Ocu–Source, another distributor which gave a discount. Press stopped selling to Ocu–Source.

On June 15, 1990, Charles Schmall, president of ODM, wrote to all of ODM's distributors. Schmall stated, in part:

> Among other things, it is vital that our products be sold by responsible high quality retailers and that they be displayed in dignified, inviting premises. The image of the products is tarnished when they are sold to consumers by retailers whose interest is solely in turnover volume but not in long-term consumer satisfaction or brand loyalty. Discount houses and other cut rate outlets motivated only by a get-rich-quick philosophy are not retailers who can be expected to value or preserve that image. Our company's firm policy is that sales to such retailers or outlets will not be tolerated.

Exhibit 13 to Plaintiff's Concise Statement of Facts, p. 1.

ODM reviewed the volume of the purchases of its distributors at various times in order to determine whether these distributors were selling to mass marketers or to warehouse outlets. ODM hired a private investigator to attempt to ascertain how Price Club, a volume distributor, was obtaining Ralph Lauren/Polo merchandise.

On February 26, 1991, ODM wrote to its distributors, including Glacier, and reminded these distributors of the policy of ODM against selling to discount stores and volume distributors and informing its distributors that ODM may not continue to do business with those distributors who violate its policy.

In June, 1991, ODM entered into a written distributorship agreement with each of its

distributors which allocated the territory of each distributor and limited the distributor's sales to "optical stores."

ODM offered to enter into the written distributorship agreement with Glacier. Glacier objected to numerous provisions in the proposed agreement, including 1) a term ending December, 1993 without a provision for renewal; 2) the provision that Glacier give up its largest customers (Costco and Wal–Mart); and 3) the refusal of ODM to permit Glacier to sell to retailers who deviate materially from the retail price structure which prevails among optometrists, ophthalmologists, and retail opticians.

A number of distributors wanted to meet with ODM. ODM arranged a meeting to be held on July 12, 13 and 14, 1991 in Chicago, Illinois. One of the items on the agenda for the three-day meeting was a discussion of "off price retailers/warehouse."

On the morning of July 13, 1991, a distributor council was formed. Each regional group of distributors chose one person from its group to represent it on an "Inner Council." Jack Hodes, a distributor who had complained about sales to volume discounters, was a member of the "Inner Council." The purpose of the Inner Council was to facilitate communication between ODM and its distributors. Topics on the agenda for the Inner Council included buying groups, "off price" retailers, and discounts to retailers.

On August 28, 1991, ODM terminated the distributorship of Glacier in part because Glacier would not agree to the customer limitations in the proposed written agreement between ODM and Glacier.

On September 5, 1991, ODM informed the Inner Council as follows:

> Glacier Optical was recently delisted because they were selling to the discount warehouses, Costco and Wal–Mart.

> This has been a major concern for Optique Du Monde as well as its distributors. Optique Du Monde has refused to sell to Wal–Mart. Polo has been diverted to other discount warehouses such as K–Mart, Price Club and Price–Savers.

> The stores should be checked out for Polo products. Exhibit 19 to Plaintiff's Concise Statement of Facts, p. 2.

On September 20, 1991, Glacier filed this action against ODM and Safilo America, alleging antitrust violations as well as state law claims for breach of contract and fraud.

## CONTENTIONS OF ODM AND SAFILO AMERICA

ODM and Safilo America contend that they are entitled to an order of summary judgment in their favor on the antitrust claims brought by Glacier. ODM argues that its decision to stop dealing with Glacier was a unilateral decision made by ODM. ODM argues that there is no evidence that any of the complaining parties sought the termination of Glacier or that the termination of Glacier was in response to any complaints. ODM argues that there is no evidence that it consulted with any other party in deciding to terminate Glacier, and that no other distributor had any input into its decision to terminate Glacier.

ODM explains that the evidence is undisputed that Glacier was terminated because of its inability to reach an agreement with ODM on the terms of a written distributorship contract, and that no other parties were involved in negotiations for the distributorship contract.

ODM contends that there is no evidence of an agreement on price or price levels between ODM and its distributors or retailers. ODM contends that Glacier was not the victim of a group boycott or the victim of a concerted refusal to deal.

ODM contends that it had legitimate business reasons to terminate Glacier. ODM explains that it was concerned that sales by mass marketing and warehouse outlets such as Costco, Shopko and Wal–Mart could be detrimental to the image of the Polo line; that ODM was responsible for protecting the Polo image; and that continued sales of Polo products by its distributors to mass marketers and warehouse outlets could jeopardize its license with Polo.

ODM contends that it is entitled to an order of summary judgment as to the federal

and state antitrust claims, as well as the claims for breach of contract, tortious interference with contract, and fraud.

In addition, Safilo America contends that it is not subject to the jurisdiction of this court.

Finally, ODM contends that there is no defense to its counterclaim for sums owing on account.

## CONTENTIONS OF GLACIER

Glacier contends that it is entitled to summary judgment with respect to the liability of ODM and Safilo America for violations of Section 1 of the Sherman Act.

Glacier contends that ODM and Glacier operate at the same market level selling eyewear to retailers; that the records of the Inner Council prove that the competitors of Glacier—ODM, Safilo America, and other distributors—collaborated to eliminate competition. Glacier contends that this collaborative effort by ODM and the other distributors to restrain trade is illegal *per se* and eliminates any factual inquiry as to the competitive unreasonableness of the agreement.

## APPLICABLE STANDARD

■ Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact.

■ Once the initial burden of the moving party is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The non-moving party must make a sufficient showing on all essential elements of the case with respect to which the non-moving party has the burden of proof. *Id.*

■ The decision faced by the court is essentially the same decision faced by a court on a motion for a directed verdict—that is, whether the evidence on the motion for summary judgment presents a sufficient dis-

agreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). If reasonable minds could differ as to the conclusions drawn from the evidence in the record, the motion for summary judgment should be denied. *Id.*

## APPLICABLE ANTITRUST LAW

Section 1 of the Sherman Act provides, in relevant part, as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

In order to show a combination or conspiracy in restraint of trade or commerce, "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3rd Cir.1980)).

Unilateral action by the manufacturer is not proscribed. *Id.* 465 U.S. at 760, 104 S.Ct. at 1469. As the Supreme Court has explained:

[A] manufacturer is not guilty of a combination or conspiracy if he merely "indicates his wishes concerning prices and declines further dealings with all who fail to observe them * * *"; however there is unlawful combination where a manufacturer "enters into agreements—whether express or implied from a course of dealing or other circumstances—with all customers * * * which undertake to bind them to observe fixed resale prices."

*United States v. Parke, Davis and Co.*, 362 U.S. 29, 39, 80 S.Ct. 503, 509, 4 L.Ed.2d 505 (1960) (quoting *United States v. A. Schrader's Son, Inc.*, 252 U.S. 85, 99, 40 S.Ct. 251, 253, 64 L.Ed. 471 (1920)).

The Supreme Court has since gone beyond this rule to state that "an unlawful combination is not just such as arises from a price maintenance *agreement,* express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy." *Parke, Davis,* 362 U.S. at 43, 80 S.Ct. at 511 (emphasis in original).

In *Federal Trade Comm'n v. Beech–Nut Packing Co.,* 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922), the Supreme Court held that the Sherman Act was violated where the methods by which the company secured the cooperation of its distributors and customers were as effectual as express or implied agreements intended to accomplish the same purpose. Beech–Nut, without having entered into any agreements, was found to have suppressed freedom of competition by the coercion of its customers through special agents of the company, by reports of competitors about customers who violated resale prices, and by boycotts of price cutters. Beech–Nut had refused to sell to wholesalers who sold to retailers who would not adhere to a schedule of resale prices. To detect violations, the company utilized code numbers on its products and instituted a system of reporting. When a violator was cut off, it would be reinstated upon the giving of assurances that it would maintain prices in the future. The Court found that "the Beech–Nut system goes far beyond the simple refusal to sell goods to persons who will not sell at stated prices, which in the Colgate Case was held to be within the legal right of the producer." *Id.* at 454, 42 S.Ct. at 154–55.

In *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 765, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984), Monsanto had:

approached price-cutting distributors and advised that if they did not maintain the suggested resale price, they would not receive adequate supplies of Monsanto's new corn herbicide.... When one of the distributors did not assent, this information was referred to the Monsanto regional office, and it complained to the distributor's parent company. There was evidence that the parent instructed its subsidiary to comply, and the distributor informed Monsanto that it would charge the suggested price.

In addition, the president of Spray–Rite had testified that officials of Monsanto made explicit threats in order to terminate Spray–Rite as a distributor unless it raised its prices. Monsanto also distributed a newsletter four weeks after Spray–Rite, a distributor of Monsanto's products, was terminated for price-cutting, which stated, in pertinent part:

In other words, we are assured that Monsanto's company-owned outlets will not retail at less then their suggested retail price to the trade as a whole. Furthermore, those of us on the distributor level are not likely to deviate downward on price to anyone as the idea is implied that doing this possibly could discolor the outlook for continuity as one of the approved distributors during the future upcoming seasons. So, none interested in the retention of this arrangement is likely to risk being deleted from this customer service opportunity. Also, as far as the national accounts are concerned, they are sure to recognize the desirability of retaining Monsanto's favor on a continuing basis by respecting the wisdom of participating in the suggested program in a manner assuring order on the retail level "playground" throughout the entire country. It is elementary that harmony can only come from following the rules of the game and that in case of dispute, the decision of the umpire is final.

*Id.* at 766, 104 S.Ct. at 1472.

The Supreme Court held that while the actions of Monsanto could have been viewed as unilateral, it was reasonable for a jury to find an "agreement" in violation of the Sherman Act when the direct and circumstantial evidence was viewed as a whole.

### ANALYSIS

There are three types of claims made by Glacier against ODM and Safilo America in this case: 1) antitrust claims; 2) breach of contract claims; and 3) tort claims.

### 1. *Antitrust Claims*

■ The evidence in this case is that ODM terminated its distributorship agreement with Glacier because Glacier refused to stop selling to price-cutting retailers or volume distributors. There may have been other factors in the decision of ODM to terminate Glacier, but the refusal of Glacier to agree to the customer restrictions in the written agreement proposed by ODM was a major factor in the decision of ODM to terminate Glacier as a distributor. It was not a violation of antitrust laws for ODM to terminate Glacier because Glacier refused to agree to the customer restrictions in the written agreement proposed by ODM if ODM acted unilaterally in terminating Glacier. There is no evidence that ODM acted other than unilaterally.

It was the policy of ODM to restrict distribution of Ralph Lauren/Polo eyewear to optometrists, ophthalmologists, and retail opticians. It was the policy of ODM to discourage, and eventually to prohibit, its distributors from selling to volume discount merchandisers and to other distributors. There is no evidence that distributors of ODM products collaborated among themselves or with ODM in establishing these policies.

Complaints by other ODM distributors or retailers about the sale of Ralph Lauren/Polo products by warehouse outlets do not denote concerted activity. *See Jeanery, Inc. v. James Jeans, Inc.,* 849 F.2d 1148, 1158–59 (9th Cir.1988). Neither do the meetings of the distributor council of ODM in July, 1991 denote concerted activity.

The distributor council met in July, 1991 to exchange information about the marketing of ODM products. The policy of ODM to restrict customers was well in place prior to the formation of the distributor council. There is no evidence that the distributor council played any role in establishing the policies of ODM to restrict customers. At the time that the distributor council first met, ODM and Glacier were involved in the dispute over the terms of the written agreement, which ultimately lead to ODM's termination of Glacier. The distributors at the meeting held in July, 1991 had already signed written agreements, which included the provision restricting customers. There is evidence that Glacier communicated the policies through the distributor council and reported the termination of Glacier to the distributor council, but there is no evidence that the distributor council had any role in the decision of ODM to terminate Glacier.

ODM informed Glacier and its other distributors of its policy of customer restrictions; ODM entered into written agreements with its distributors which included this policy; ODM attempted to negotiate a written agreement with Glacier which included this policy; these negotiations were not successful; and ODM decided to terminate Glacier. Glacier was terminated as a result of a unilateral decision by ODM to adopt and to enforce a policy of customer restrictions.

The court has thoroughly examined the facts presented in this case and concludes that there is no evidence of concerted activity, horizontal conspiracy, or group boycott.

### 2. *Breach of Contract Claims*

Glacier seeks damages from ODM for breach of express and implied contractual promises. Glacier alleges that ODM made express promises 1) that Glacier would have an exclusive distributorship as long as Glacier kept up its sales activities; 2) that the terms of the distributorship agreement would be memorialized in a written agreement; and 3) that the written agreement would "grandfather in" accounts existing at the time the agreement was signed.

In addition, Glacier alleges that ODM breached an implied contractual duty of good faith and fair dealing that imposed on ODM a duty not to take unfair advantage of Glacier's confidential customer information.

ODM argues that the statute of frauds contained in the Uniform Commercial Code of the State of Washington bars enforcement of the express and implied contractual promises. ODM further argues that the terms of the alleged oral contract are too indefinite to be enforceable, and that there was no enforceable contract to "grandfather in" Glacier's accounts. Finally, ODM argues that it did not appropriate confidential information relating to customer accounts.

Glacier argues that the oral promises of ODM to authorize Glacier as an exclusive distributor for as long as Glacier continued to sell sufficient numbers of frames is not rendered unenforceable by the statute of frauds. Glacier argues that the statute of frauds is satisfied by ODM's own writings, and the contract is not one which, by its own terms, could have been performed within a year of its making. Glacier argues that ODM is estopped by its promise to commit the agreement to writing from invoking the statute of frauds, and further that part performance avoids the statute of frauds.

■ Glacier argues that there is a sufficient writing in this case to satisfy the statute of frauds and points to a letter written to Greg and Evelyn Edens of Glacier by Charles Schmall of ODM on June 3, 1991. In the letter, Schmall states, in part:

[W]e at Optique Du Monde are delighted to be entering into the 1990's with a sterling organization such as yours.

To solidify our new partnership with you and our other distributors, we are planning our first distributor gathering. . . .

. . . .

We hope the next seven months of this year are the greatest you will ever have in the optical business, and will be the prelude of many successful years to come. [W]e are looking forward to many years of prosperity together.

Exhibit 18 to Affidavit of Jerry L. Lawson, Jr., p. 1.

In addition, Glacier relies upon a "Customer Sales Report" dated August 23, 1989, in which an ODM salesperson wrote about Glacier: "7 mo 1989 sales $70,000—growing—just hired new saleswoman (Kim Alhadeff) seems very capable—PUSHING for "exclusive" contract they feel they were promised in March. Purchased all products with small stock back up." *Id.* at Exhibit 19, p. 1.

Glacier contends that the statute of frauds requires only a signed writing which establishes that the claim is about a real agreement. Glacier contends that the letter of Schmall and the "Customer Sales Report" preclude ODM from raising the statute of frauds, and that the trier of fact should be permitted to consider its claims for breach of contract.

The laws of the State of Washington govern the evaluation of the contract claims. Section 62A.2–201 of the Revised Code of Washington provides, in part:

Formal requirements: Statute of Frauds. (1) Except as otherwise provided in this section, a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

The contract alleged here involves a sale of goods for a price of more than five hundred dollars.

There is nothing in the letter of June 3, 1991 from Schmall to Glacier which indicates that there was an agreement between the parties for a "long-term" relationship or for an exclusive distributorship in the States of Oregon and Washington. The letter from Schmall refers to the proposed relationship as "our new partnership with you," and Glacier did not sign the agreement proposed by the letter.

The note dated August 23, 1989 does not provide any evidence that ODM agreed at any time to an exclusive long-term relationship. The court concludes that there is no writing in this case which satisfies the requirements of the statute of frauds.

■ In addition, Glacier contends that the alleged agreement does not fall within the statute of frauds because the contract is one which, by its terms, could have been performed within a year of its making. While it is true that the alleged agreement for an exclusive territory for as long as Glacier kept up its sales activities was capable of being discharged or excused within a year, the terms of the alleged contract, with reference

to the surrounding circumstances, lead only to the conclusion that performance of the alleged contract was not contemplated to be completed within one year, and that the requirement of a writing cannot be excused by the exception for contracts capable of being performed within a year of their making.

In addition, Glacier contends that the contract claims should not be barred because ODM is estopped by its promise to commit the agreement to writing from invoking the statute of frauds. Even assuming that this claim of promissory estoppel would be sufficient to avoid the statute of frauds, there is no evidence in this case that ODM agreed to commit to writing the terms of the contract alleged by Glacier.

Finally, Glacier contends that the alleged exclusive dealership contract is taken out of the statute of frauds by part performance. "One of the requirements of the doctrine of part performance is that acts relied upon as constituting part performance must unmistakably point to the existence of the claimed agreement." *Wagers v. Associated Mortgage Investors*, 19 Wash.App. 758, 577 P.2d 622, 626 (1978).

Glacier contends that it partly performed the agreement by hiring additional sales people, buying and maintaining a significant inventory of ODM products, and marketing and selling quantities of ODM products. These claims are not adequate to satisfy the requirement that the acts relied upon as constituting part performance unmistakably point to the existence of an agreement that Glacier would have an exclusive contract to distribute ODM merchandise in the States of Oregon and Washington as long as Glacier did a good job. The alleged acts unmistakably point only to a desire to resell ODM products and do not unmistakably point to any further terms of any alleged agreement.

In conclusion, the court finds that the breach of contract claims are barred by the statute of frauds. Further, the court finds that there are no facts to support a claim that ODM breached an implied contractual duty of good faith and fair dealing.

### 3. *The Tort Claims*

Glacier asserts claims for the tortious interference with the contract and prospective advantage and for fraud.

■ In order to prevail on its tortious interference with the contract and prospective advantage claims, Glacier must prove: "(1) Existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy by the alleged interfering parties; (3) intentional interference inducing or causing breach or termination of the relationship or expectancy; and (4) resultant damage." *Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wash.App. 1, 776 P.2d 721, 726 (1989). Glacier seeks to apply the laws of the State of Oregon in order to take advantage of the fact that the laws of the State of Oregon allow punitive damages for this claim.

Whether the court applies the law of the State of Oregon or the law of the State of Washington, Glacier must prove an intentional interference wrongful by some measure beyond the fact of the interference itself, such as an improper motive or the use of improper means. There are no facts in this case to satisfy such a burden.

■ Glacier contends that its fraud claim is, almost by definition, a question of fact because Glacier alleges that ODM made fraudulent promises. The only facts in this case show a course of dealing between business parties. The parties were not able to reach an agreement as to an integral part of the negotiations; a written agreement was possible; and the business relationship was terminated. There are no facts to support a claim of fraud.

### 4. *Quasi–Contract Claims*

■ Glacier makes two claims—one entitled "quantum merit" and the other entitled "unjust enrichment"—based upon allegations that Glacier made certain expenditures which conferred a benefit upon ODM, such as an investment in inventory, maintenance of sales personnel, marketing, and divulging confidential customer information to ODM. The only facts in this case are that Glacier paid ODM for inventory ordered and resold this

inventory at a profit. These facts cannot form the basis for a claim for quantum merit or unjust enrichment.

### 5. *ODM's Counterclaim for Monies Owed on Account*

The claim involves a claim for $54,179.90. Glacier asserts that questions of fact regarding its claims for damages offset any claim for accounts receivable. The court has resolved these factual issues against Glacier and has found that there is no factual basis for the claims by Glacier of offset. The court finds that ODM is entitled to recover on the counterclaim for monies owed.

### CONCLUSION

The motion of defendants for summary judgment (# 107) is granted. The motion of Glacier for partial summary judgment (# 114) is denied. Defendants shall prepare the appropriate judgments.